**JEWS FOR JESUS, Plaintiff,**

v.

**Steven C. BRODSKY, Defendant.**

**No. CIV. A. 98–274(AJL).**

United States District Court,
D. New Jersey.

March 6, 1998.

 Michael N. Karp, Livingston, NJ, Paul A. Winick, Thelen, Marrin, Johnson & Bridges LLP, New York, NY, James P. Eriksen, General Counsel, Jews for Jesus, San Francisco, CA, for Plaintiff.

Ronald D. Coleman, Murray J. Laulicht, Michael J. Dunne, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for Defendant.

## OPINION

LECHNER, District Judge.

This action involves, in the words of the defendant, a "bogus" Internet site and, again, in the words of the defendant, his use of "deceit and trickery." As a result, there is a dispute [1] between the plaintiff, Jews for Je-

---

1. In essence, this dispute involves the validity of, and alleged infringement and dilution by the defendant of, the service marks "Jews f☼r Jesus" and "Jews for Jesus." The dispute does not

sus (the "Plaintiff" or the "Plaintiff Organization"), and the defendant, Steven Brodsky (the "Defendant"), in connection with the use by the Defendant of the Internet[2] domain names[3] "jewsforjesus.org" and "jews-for-jesus.com".[4]

On 23 January 1998, the Plaintiff filed a complaint (the "Complaint"). The Plaintiff contends the deliberate diversion by the Defendant of Internet users to the Internet site established by the Defendant "has caused and is causing irreparable harm to [P]laintiff, in violation of federal, state and common laws governing trademark and unfair competition." Complaint ¶ 12. Specifically, the Plaintiff Organization seeks, among other things, a preliminary injunction enjoining the Defendant from (1) diluting the federally-registered service mark, "Jews for Jesus" and the common law service mark, "Jews for Jesus" (2) infringing the registered mark of the Plaintiff Organization, (3) unfairly competing and falsely designating, describing and representing the origin of the Internet Web[5] sites maintained by the Defendant, (4) diluting the Plaintiff's mark pursuant to state statutory law, (5) infringing Plaintiff's rights in its name and registered mark in violation of state statutory law and (6) unfairly competing in violation of common law. See Complaint. Jurisdiction is alleged pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, 1338 and 1367. See id. ¶ 1.

Currently before the court is an order to show cause (the "Order to Show Cause") seeking a preliminary injunction[6] filed by the

---

implicate rights granted by the First Amendment of the United States Constitution.

The content of the speech of the defendant is not at issue in this action. See Memorandum of Law of Steven C. Brodsky in Opposition to Plaintiff's Application for a Temporary Restraining Order and Order to Show Cause (the "Defendant Brief") at 32–34; Plaintiff's Memorandum in Support of Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction (the "Plaintiff Brief") at 4; Plaintiff's Revised Reply Memorandum to Defendant's Memorandum in Opposition of Motion for Temporary Restraining Order and Order to Show Cause (the "Plaintiff Reply Brief") at 14–15; see also Planned Parenthood Fed'n of Am. v. Bucci, No. 97–629, 1997 WL 133313, at *10 (S.D.N.Y. March 24, 1997) ("Planned Parenthood"), aff'd by Summary Order (2d Cir. Feb. 9, 1998) (finding use by defendant of plaintiff's service mark in domain name was not protected by First Amendment because it was not part of communicative message but instead was source identifier).

2. "The 'Internet' is a general term for the modern development of communications among the nationwide and indeed worldwide network of computers. 'The Internet is not a physical or tangible entity, but rather a giant network which interconnects innumerable smaller groups of linked computer networks. It is thus a network of networks.'" SF Hotel Co. v. Energy Invests., Inc., No. 97–1306, 1997 WL 749498, at *3 (D.Kan. Nov.19, 1997) (quoting ACLU v. Reno, 929 F.Supp. 824, 830 (E.D.Pa.1996)).

3. "Domain names are used to locate information on the Internet. Each computer or network linked to the Internet has a unique numerical address called an Internet Protocol number ("IP number"). An IP number is four groups of digits separated by decimal points, for example, '013.917.114.41.' These IP numbers are convert-ed into a more user-friendly, letter based format called a 'domain name' by specialized computers called 'domain name servers.' Academy of Motion Picture Arts and Sciences v. Network Solutions Inc., 989 F.Supp. 1276, 1281 n. 1 (C.D.Cal. 1997). A domain name 'consists of two parts: a host and a domain.... The Internet is divided into several domains, for example: com—commercial business; net—network or communications organization; edu—educational institution; org—non-profit organization; gov—government.' Interstellar Starship Servs., Ltd. v. Epix, Inc., 983 F.Supp. 1331, 1335 (D.Or.1997). In the case of 'jews-for-jesus.org', the host is 'jews-for-jesus' and the domain is 'org'". See id.

4. The Defendant asserts that, on 1 February 1998, he contacted Network Solutions, Inc. ("NSI"), an entity responsible for registering domain names, and requested that it delete his registration of the domain name "jews-for-jesus.com". See Certification of Steven C. Brodsky (the "Brodsky Certif."), dated 6 February 1998, ¶ 1. It is unclear whether the request by the Defendant was triggered by the institution of this action which was commenced on 23 January 1998. It appears that this domain name has been deleted. As such, the only domain name that appears to be disputed is "jewsforjesus.org".

5. "The 'Web' or 'World Wide Web' refers to the collection of sites available on the Internet." Zippo Manuf. Co. v. Zippo Dot Com, Inc., 952 F.Supp. 1119, 1121 (W.D.Pa.1997).

6. The Plaintiff initially sought a temporary restraining order (a "TRO") as well as a preliminary injunction. At a hearing on 13 February 1998 (the "13 February Hearing"), the Plaintiff agreed to treat the hearing as one seeking a preliminary injunction rather than one seeking a

Plaintiff. For the reasons set forth below, the request for a preliminary injunction is granted.[7]

## I. BACKGROUND

### A. Procedural History

On 28 January 1998, the Plaintiff Organization filed the Order to Show Cause. The Defendant appears to have been initially served with the Order to Show Cause via electronic mail on 27 January 1998.[8] *See* Winick Affidavit ¶ 7. At the 28 January Hearing, decision was reserved on the Order to Show Cause and a return date was initially set for 10 February 1998 to allow the Defendant an opportunity to file opposition. The return date was adjourned to 13 February 1998 to allow the Plaintiff Organization an opportunity to file a brief in reply to the Defendant Brief.

At the 13 February Hearing, the parties were heard on the issue of whether a preliminary injunction should be issued. The parties declined, however, to treat the 13 February Hearing as a hearing for a permanent injunction. *See* 13 February Hearing Tr. at 4.

### B. Facts

#### 1. The Parties

##### a. The Plaintiff Organization

The Plaintiff Organization is a non-profit, international outreach ministry that was founded in 1973. *See* Perlman Amended Aff. ¶ 4. It is organized under the laws of the State of California and maintains its principal place of business in San Francisco, California. *See* Complaint ¶ 5. The Plaintiff Organization teaches Jesus is the Messiah of Israel and the Savior of the World; its mission includes advocacy, education and religious camaraderie for both Gentiles and Jews. *See id.* ¶ 4; Perlman Amended Aff. ¶ 4. The Plaintiff Organization employs approximately 145 staff members, has twelve permanent branches worldwide and an additional sixty-eight chapters which perform voluntary activities on its behalf. *See id.* ¶ 7.

The Plaintiff Organization asserts it has used the name "Jews for Jesus" continuously in interstate commerce for more than twenty-four years. *See* Complaint ¶¶ 13–14; Perlman Amended Aff. ¶ 4. As such, throughout the Complaint it is asserted that the phrase "Jews for Jesus" is a common law service mark. *See, e .g.,* Complaint ¶¶ 11–14, 16, 37–39, 47–49, 63, 70, 74 and 75. The Plaintiff also asserts it owns the rights to the stylized service mark "Jews f☆r Jesus" (the "Mark") that was registered (U.S.Reg. No. 1,252,889) on the Principal Register of the United States Patent and Trademark Office (the "PTO") on 4 October 1983 (the "Regis-

---

TRO. *See* 13 February Hearing Transcript (the "13 February Hearing Tr.") at 3–4.

**7.** In support of the Order to Show Cause, the Plaintiff submitted: the Plaintiff Brief; Affidavit of Susan G. Perlman (the "Perlman Aff."), dated 26 January 1998, attaching unnumbered exhibits; Affidavit of Vijay Chellathurai (the "Chellathurai Aff."), dated 26 January 1998; Affidavit of Michael B. Kalstein (the "Kalstein Aff."), dated 24 January 1998; Affidavit of Sheri A. Byrne (the "Byrne Aff."), dated 26 January 1998; Affidavit of Paul A. Winick (the "Winick Aff."), dated 28 January 1998, attaching Exhibits A through B; Amended Affidavit of Vijay Chellathurai (the "Chellathurai Amended Aff."), dated 3 February 1998; Amended Affidavit of Susan G. Perlman (the "Perlman Amended Aff."), dated 3 February 1998, attaching Exhibits 1 through 5; Affidavit of Donald Sanchez (the "Sanchez Aff."), dated 9 February 1998, attaching unnumbered exhibits; the Plaintiff Reply Brief; Supplemental Affidavit of Susan G. Perlman (the "Perlman Supplemen-

tal Aff."), dated 9 February 1998, attaching Exhibits 1 through 5; and a letter, dated 17 February 1998.

In opposition to the Order to Show Cause, the Defendant submitted: the Defendant Brief; the Brodsky Certif.; Affidavit of Ronald D. Coleman, Esq. (the "Coleman Aff."), dated 6 February 1998, attaching Exhibits A through N; a letter, dated 16 February 1998 (the "16 February Letter"); a letter, dated 17 February 1998; and a letter, dated 19 February 1998 (the "19 February Letter").

**8.** The Defendant alleges he did not receive notice of the intention by the Plaintiff to file the Order to Show Cause. *See* Brodsky Certif. ¶ 4. At a hearing on 28 January 1998 (the "28 January Hearing"), the Plaintiff was directed to serve the Defendant with the Order to Show Cause. It appears the Plaintiff complied with this directive; the Defendant filed opposition to the Order to Show Cause.

tration").[9] *See id.* ¶ 15; Perlman Amended Aff. ¶ 6. According to the Plaintiff, the Mark has been maintained since that date and is now incontestable pursuant to 15 U.S.C. § 1065 ("Section 1065"). *See* Plaintiff Brief at 6; Plaintiff Reply Brief at 4–5. The Registration indicates the Mark fits within International Classification 16 ("Class 16") and is for "Religious Pamphlets." *See* Exhibit A to the Complaint, at 2.

The Plaintiff Organization distributes throughout the United States four publications in connection with its ministry and a catalog of merchandise. *See* Perlman Amended Aff. ¶ 8. The Plaintiff Organization has fulfilled its "mission by providing education and information through classes, lectures, meetings, television, radio and the dissemination of information through magazines, brochures, newspapers and the Internet to millions people in the United States and abroad." *Id.* ¶ 4. As well, the Plaintiff "has conducted annual advertising campaigns since 1982." *Id.* The Plaintiff Organization "has expended a substantial amount of money publishing ads in national publications like the *New York Times,* the *Washington Post,* the *Wall Street Journal, Newsweek, Parade,* and *TV Guide." Id.* In addition, the Plaintiff Organization has conducted annual advertising campaigns[10] on New Jersey-based radio stations and in numerous local and national newspapers and has advertised on billboards and in the transit system in the New York/New Jersey metropolitan area. *See id.* ¶¶ 9–10, 14; Exhibit 2 to Perlman Supplemental Aff. ¶ 6; *see also* Complaint ¶ 63.

Representatives of the Plaintiff Organization have appeared on numerous radio and television programs and have distributed throughout New York City pamphlets regarding the teachings of the Plaintiff Organization.[11] *See* Perlman Amended Aff. ¶ 12. The Mark appears on most of the Plaintiff Organization advertisements and on its Internet Web site. *See id.* ¶ 11; Perlman Supplemental Aff. ¶ 6. At the 13 February Hearing, counsel for the Plaintiff Organization acknowledged some of the advertisements and literature distributed by the Plaintiff Organization does not contain the stylized letter "O" ("✿") in the word "for" when referring to the Plaintiff Organization. *See* 13 February Hearing Tr. at 35. Nevertheless, the Plaintiff has established it "has continuously used the name Jews for Jesus in its publications, media ads and other communications throughout the United States during the past 24 years." Perlman Amended Aff. ¶¶ 5–6.

It is the position of the Plaintiff Organization "[t]hat by virtue of its extensive national use of the name Jews for Jesus and, particularly, its use in the New York/New Jersey Metropolitan area, Jews for Jesus has developed significant recognition and good will. The name Jews for Jesus has come to be recognized by the public as identifying [the Plaintiff Organization] and its mission, message and services." *See id.* ¶ 24. "Furthermore, the dissemination of the name on the Internet through Jews for Jesus' Web site has established the name among people who use the Internet as being synonymous with

---

9. The Registration for the Mark indicates that its "Last Listed Owner" is "Hineni Ministries." *See* Exhibit A to Coleman Aff. The Plaintiff is listed on the registration as "Assignee." *See id.* Despite this fact, the Defendant half-heartedly argues there is no evidence that the Plaintiff Organization is the current owner of the Mark. *See* 13 February Hearing Tr. at 27–28. The Defendant, however, has not presented any evidence to refute the contents of its own exhibit (Exhibit A to Coleman Aff.) or to suggest that the Plaintiff Organization is not the owner of the Mark. *See id.* at 28.

10. Since 1988, the Plaintiff Organization has expended an average of $497,679.70 per year on advertising. *See* Exhibit 1 to Perlman Supplemental Aff.

11. The Plaintiff Organization contends its representatives have distributed more than 35,000,000 pamphlets in public venues throughout the United States. *See* Perlman Amended Aff. ¶ 4. The Complaint states that a search on LEXIS/NEXIS in the ALLNEWS file reveals that, since 1992, more than 857 news articles have been written about the Plaintiff Organization. *See* Complaint ¶ 18. In addition, the Complaint states that a search on the Internet reveals more than 2300 Web site pages containing some discussion of the Plaintiff Organization. *See id.* The Defendant has not disputed that the Plaintiff Organization has received extensive coverage by the media.

the mission and message of the [Plaintiff O]rganization." *Id.* It appears the Plaintiff Organization has extensively advertised its "mission, message, and services, in national and local publications" over the past ten years. Perlman Supplemental Aff. ¶¶ 4. A year-by-year breakout of these expenditures is located in Exhibit 1 to the Perlman Supplemental Aff. *See id.*

In March 1995, the Plaintiff Organization established an Internet site with the domain name "jews-for-jesus.org". *See* Perlman Amended Aff. ¶ 16. This domain name does not contain the stylized letter "O" ("✡") in the word "for". During the 13 February Hearing, counsel for the Plaintiff Organization indicated the domain name omits spaces before and after the word "for," and does not contain the stylized letter "O" ("✡") in that word, because such characters are not recognized in domain names. *See* 13 February Hearing Tr. at 4 (incorporating arguments set forth in papers submitted in support of Order to Show Cause). The "jews-for-jesus.org" Internet site contains information about, among other things, the mission and message of the Plaintiff Organization. *See* Perlman Amended Aff. ¶ 17. Significantly, the Plaintiff Organization Internet site also contains electronic versions of many of its publications. *See id.* None of these publications, however, can be downloaded. *See* Plaintiff Reply Brief at 10. The Plaintiff Organization Internet site offers various items for sale, *see* Perlman Amended Aff. ¶ 17; it is commercial in nature.

12. Some of the statements attributed to the Defendant and which concern the Plaintiff Organization and the intent of the Defendant Internet site appear in various newspapers. The Defendant has not denied making these statements. At the 13 February Hearing, counsel for the Defendant acknowledged the Defendant made these statements but stated that they may have been taken out-of-context. *See* 13 February Hearing Tr. at 31.

13. The following text appears on the Internet site maintained by the Defendant:
Jews for Jesus?
Are you interested in learning about Jews and Jesus?
Want to know why one cannot believe in Jesus and be a Jew?
**The answers you seek already exist within your faith.**
*Come home to the truth and beauty of Judaism.*

### b. *The Defendant*

The Defendant is a professional Internet site developer. *See* Brodsky Certif. ¶ 3. The Plaintiff Organization contends the Defendant is also an attorney who is "a vocal opponent" of its mission, teachings, message and services. *See* Plaintiff Brief at 6.

The Defendant admits he has critical things to say about the Plaintiff Organization which he asserts are protected by the First Amendment. *See* Defendant Brief at 5, 32–34. The following statements [12] about the Plaintiff Organization have been attributed to the Defendant:

The Jews for Jesus cult is founded upon deceit and distortion of fact. *See* Exhibit E to the Complaint; Exhibit 2 to Perlman Amended Aff.

[T]he whole program [of Jews for Jesus] is based on deceit and trickery, preying on people who are confused. Two can play at that game. *See* Exhibit 3 to Perlman Amended Aff., at 1.

In mid-to-late December 1997, the Defendant "posted" the Internet site "jewsforjesus.org" that is the subject of this action. *See* Brodsky Certif. ¶ 1. The Defendant Internet site consists of approximately one page of text [13] and refers to the Plaintiff Organization by its common law service mark "Jews for Jesus" and not by its federally-registered service mark "Jews f✡r Jesus." *See* Exhibit E to the Complaint; Perlman Amended Aff. ¶ 28. The Defendant Internet site contains a "hyperlink" [14] to the Outreach

**Don't be fooled.**
Click *here* to learn more about how the Jews for Jesus cult is founded upon deceit and distortion of fact.

**PLEASE NOTE**
This website is an independent project which reflects the personal opinion of its owner, and is in no way affiliated with the Jewish organization Outreach Judaism, or the Christian organization Jews for Jesus.
Send all correspondence to *stevebro@worldnet.att.net*
*See* Exhibit E to the Complaint (emphasis in original). An effort was made to depict in this footnote the text of the Defendant Internet site, as accurately as possible.

14. A "hyperlink" is a " 'highlighted text or images that, when selected by the user, permit[s] him [or her] to view another, related Web document.' " *Bensusan Restaurant Corp. v. King,* 126

Judaism (the "Outreach Judaism Organization") Internet site. *See id.*

The Outreach Judaism Organization is also a vocal opponent of the views espoused by the Plaintiff Organization. *See* Perlman Amended Aff. ¶ 28. The Internet site for the Outreach Judaism Organization offers for sale certain items, including audio tapes and books. *See id.*; Complaint ¶ 33; *see also* Exhibit F to the Complaint. It is commercial in nature.

The Defendant appears to have been aware of the existence of the Plaintiff Organization and the extensive advertising efforts of the Plaintiff Organization prior to the registration of his domain name. He was quoted as stating:

> I was seeing their ads all over the place on the subways and in the newspapers with their obscene messages, and I noticed they were heavily promoting their websites....

*See* Complaint ¶ 42 (citing 9 January 1998 *Jewish Week* article). It also appears the Defendant was aware of the federally-registered and common law service marks of the Plaintiff Organization.

The Defendant reportedly stated that he started his Internet site because the Plaintiff Organization "rubs [him] the wrong way." *See* Exhibit I to the Complaint. In addition, the Defendant has been reported as stating that the

> intent behind my bogus "Jews for Jesus" site (www.jewsforjesus.org) is to intercept potential converts before they have a chance to see the obscene garbage on the real J4J site.

*See* Exhibit J to the Complaint. He also was quoted as stating "I thought I could provide an educational counterpoint against [the Plaintiff Organization's] lies." *See* Complaint ¶ 42. In the Defendant Brief, it is argued that the intent of the Defendant Internet site is "to engage Jewish people who are interested in the topic of missionary Christians who describe themselves as Jews for Jesus and to expose these seekers to a pro-Judaism website." *See* Defendant Brief at 5. Presumably, the pro-Judaism Web site contemplated by the Defendant is the site maintained by the Outreach Judaism Organization.[15]

At the 13 February Hearing, counsel for the Defendant stated the Defendant did not choose to register the domain name "Jews for Jesus for Judaism" because there is a registered trademark for that name. *See* 13 February Hearing Tr. at 34–35. This response is somewhat peculiar considering the Defendant ·chose to use the name of the Plaintiff Organization in his domain name.

The Defendant acknowledges the Plaintiff Organization has certain rights to the service mark "Jews f☆r Jesus." *See* Defendant Brief at 1, 3–4. The Defendant contends, however, that the Plaintiff Organization does not have any rights to the phrase "Jews for Jesus" (without the symbol "☆" in the word "for") because those words are not amenable to trademark or service mark protection. *See id.* at 1–2, 12–19. As such, the Defendant argues that, because his domain name does not contain a stylized letter "O" ("☆"), the use of the phrase "jewsforjesus" in his domain name does not infringe upon the Mark. *See id.* at 1–2.

### 2. The Efforts of the Plaintiff Organization to Stop the Defendant from Using the Disputed Domain Names

In December 1997, the Plaintiff Organization learned the Defendant was operating an Internet site with the domain name "jewsforjesus.org". *See* Byrne Aff. ¶ 4; Perlman Amended Aff. ¶¶ 18–19. On 23 December 1997, the Plaintiff Organization sent a letter (the "Plaintiff's 23 December Letter") to the Defendant notifying him it was the holder of the Mark and requesting he immediately cease using the domain name "jewsforjesus.org". *See* Exhibit L to the Complaint, at 1. On 23 December 1997, the Defendant ad-

---

F.3d 25, 27 n. 1 (2d Cir.1997); *see Intermatic Inc. v. Toeppen*, 947 F.Supp. 1227, 1232 (N.D.Ill. 1996) (discussing purpose of hyperlinks).

**15.** When an Internet user visits the Defendant Internet site, he or she is invited to "click *here* to learn more about how the Jews for Jesus cult is founded upon deceit and distortion of·fact." *See supra*, note 13. If the invitation is accepted, the Internet user is connected via a hyperlink to the Internet site for the Outreach Judaism Organization.

vised the Plaintiff he did not believe his domain name infringed upon the Mark because "there are numerous and substantial differences between your alleged trademark and the domain name." *Id.* at 2. Interestingly, the Defendant apparently registered a second domain name, "jews-for-jesus.com",[16] after receiving the Plaintiff's 23 December Letter. *See* Exhibit I to the Complaint. In addition, after receiving the Plaintiff's 23 December Letter, the Defendant apparently added a disclaimer [17] (the "Disclaimer") to his Internet site. *Compare* Exhibit D of the Complaint (24 December 1997 home page for "jewsforjesus.org" without disclaimer) *with* Exhibit E of the Complaint (21 January 1998 home page for "jewsforjesus.org" with disclaimer).

On 16 January 1998, the Plaintiff sent a second letter (the "Plaintiff's 16 January Letter") to the Defendant demanding that he cease using the domain names "jewsforjesus.org" and "jews-for-jesus.com". *See* Exhibit M to the Complaint. The Plaintiff's 16 January Letter advised the Defendant his continued use of these domain names constituted a violation of the rights of the Plaintiff Organization and subjected him to penalties, including treble damages and attorney's fees. *See id.*

The Defendant contends his understanding of the legal issues involved led him to believe the claims set forth in the Plaintiff's 23 December Letter and the Plaintiff's 16 January Letter "were legally unfounded, spurious and intended to harass" him. Brodsky Certif. ¶ 2.

## II. *Discussion*

### *Standard of Review for Preliminary Injunctions*

Injunctive relief is an extraordinary remedy which should be granted only if the Plaintiff Organization produces evidence sufficient to demonstrate the following four factors:

(1) the likelihood that the Plaintiff Organization will prevail on the merits at final hearing;

(2) the extent to which the Plaintiff Organization is being irreparably harmed by the conduct complained of;

(3) the extent to which the Defendant will suffer irreparable harm if the preliminary injunction is issued; and

(4) the public interest.

*See, e.g., AT & T Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir.1994), *cert. denied,* 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); *Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994); *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 374 (3d Cir.1992); *Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 191–92 (3d Cir.1990); *Alessi v. Pennsylvania, Dep't of Pub. Welfare,* 893 F.2d 1444, 1447 (3d Cir.1990); *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3d Cir.1989); *Fechter v. HMW Indus., Inc.,* 879 F.2d 1111, 1116 (3d Cir. 1989); *Genovese Drug Stores, Inc. v. TGC Stores, Inc.,* 939 F.Supp. 340, 343 (D.N.J. 1996); *Apollo Techs. v. Centrosphere Indus.,* 805 F.Supp. 1157, 1191 (D.N.J.1992); *Glenside West Corp. v. Exxon Co., U.S.A.,* 761 F.Supp. 1118, 1132 (D.N.J.1991); *CPC Int'l, Inc. v. Caribe Food Distribs.,* 731 F.Supp. 660, 664 (D.N.J.1990); *Bascom Food Prods., Corp. v. Reese Finer Foods, Inc.,* 715 F.Supp. 616, 624 (D.N.J.1989). The grant or denial of a preliminary injunction lies within "'the sound discretion of the district judge, who must balance all of these factors in making a decision.'" *FM 103.1, Inc. v. Universal Broad. of N.Y., Inc.,* 929 F.Supp. 187, 193 (D.N.J.1996) (citing *Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir.1982); *Atlantic Coast Demolition v. Board of Chosen Freeholders of Atlantic Cty.,* 893 F.Supp. 301, 307 (D.N.J.1995)).

---

**16.** The registration for this domain name appears to have been deleted after it was registered. *See supra,* note 4.

**17.** The Disclaimer provides

**PLEASE NOTE**
This website is an independent project which reflects the personal opinion of its owner, and is in no way affiliated with the Jewish organization Outreach Judaism, or the Christian organization Jews for Jesus.

*See* Exhibit E to the Complaint (emphasis in original).

Of these four requirements, the Third Circuit has placed particular emphasis on the likelihood of success on the merits and the probability of irreparable harm, stating: " '[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent.' " *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir.1990)(quoting *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir.1982)); *see also Instant Air*, 882 F.2d at 800; *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir.1987); *Sky Vue*, 759 F.2d at 1098–99; *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir.1984). In addition, before a preliminary injunction may be issued, the applicant for the injunction usually must give security

> in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. Pro. 65; *Elliott v. Kiesewetter*, 98 F.3d 47, 59–60 (3d Cir.1996) (stating security must be given unless balance of equities weighs overwhelmingly in favor of party seeking injunction and then district court has discretion to waive Rule 65(c) bond requirement after proper finding).

### A. Likelihood the Plaintiff Organization Will Prevail on the Merits

Several federal courts presented with an Internet domain name dispute have granted an application for a preliminary injunction where the plaintiff was able to satisfy factors similar to those previously discussed. *See, e.g., Teletech Customer Care Management (Cal.) v. Tele-Tech Co., Inc.*, 977 F.Supp. 1407 (C.D.Cal.1997); *Green Products Co. v. Independence Corn By-Prods. Co.*, 992 F.Supp. 1070, 1081 (N.D.Iowa 1997); *Planned Parenthood*, 1997 WL 133313, at *12; *Playboy Enters., Inc. v. Calvin Designer Label*, 985 F.Supp. 1220, 1221 (N.D.Cal. 1997) ("*Playboy*"); *Cardservice Int'l v. McGee*, 950 F.Supp. 737, 739 (E.D.Va.), *aff'd*, 129 F.3d 1258 (4th Cir.1997) (discussing previous issuance of preliminary injunction); *Comp Exam'r Agency, Inc. v. Juris, Inc.*,

No. 96–213, 1996 WL 376600, at *1 (C.D.Cal. Apr. 26, 1996) ("*Juris*"); *Hasbro, Inc. v. Internet Entertainment Group, Ltd* ., No. 96–130, 1996 WL 84853, at *1 (W.D.Wa. Feb. 9, 1996) ("*Hasbro*"). In those cases, the court found the plaintiff had a likelihood of success on the merits and determined that the use by the defendant in its domain name of the asserted trademark created a likelihood of confusion.

For example, in *Planned Parenthood* the plaintiff was a non-profit, reproductive services organization that owned the rights to the service mark "Planned Parenthood." *See Planned Parenthood*, 1997 WL 133313, at *1. The plaintiff had facilities throughout the United States and operated an Internet site with the domain name "ppfa.org". *See id.* In August 1996, the defendant, an outspoken opponent of the plaintiff, registered the domain name "plannedparenthood.com". *See id.* A preliminary injunction was issued after a finding that the domain name and Internet site of the defendant were likely to cause confusion and that the plaintiff demonstrated a likelihood of prevailing on its claims of, inter alia, unfair competition, dilution and false designation of origin. *See id.* at *7.

A similar result occurred in *Playboy* where the plaintiff owned rights to the registered marks "Playboy" and "Playmate." *See Playboy*, 985 F.Supp. 1220, 1221. The defendant used the words "Playboyxxx" and "Playmatelive" in its domain names without permission. *See id.* An injunction was granted after a finding that the plaintiff was likely to succeed on its claims of, inter alia, trademark infringement, unfair competition and false designation of origin because the use of the marks "Playboy" and "Playmate" in the domain names of the defendant was likely to cause confusion. *See id.*

In *Hasbro*, the plaintiff was the owner of the federally registered trademark "CANDY LAND". *See Hasbro*, 1996 WL 84853, at *1. The defendants operated a sexually explicit Internet site with the domain name "candyland.com". *See id.* A preliminary injunction was issued after a finding that the plaintiff demonstrated a probability that the conduct of the defendants violated the federal and Washington state anti-dilution statutes. *See*

*id.* In addition, the court found that the use by the defendants of the "CANDY LAND" mark in their domain name was causing irreparable injury to the plaintiff. *See id.*

In *Juris,* the plaintiff owned the incontestable, federally registered trademark "JURIS." *See Juris,* 1996 WL 376600, at *1. The defendant used the mark "juris" as a second level domain name. *See id.* A preliminary injunction was granted after a finding the plaintiff demonstrated a likelihood of success on the merits. It was found that the use by the defendant of the mark constituted trademark infringement because it was likely to cause confusion as to the source or sponsorship of those goods and services. *See id.* It also was found that the use of the mark by the defendant in connection with its Internet site was causing irreparable injury to the plaintiff. *See id.*

Other courts have granted a motion for full or partial summary judgment and/or issued a permanent injunction where the use in a domain name of a trademark constituted, among other things, trademark infringement, false designation of origin and/or dilution of the trademark. *See, e.g., Lozano Enter. v. La Opinion Publ'g Co.,* No. 96–5969, 1997 WL 745036, at *1 (C.D.Cal. July 31, 1997); *Intermatic,* 947 F.Supp. at 1227; *Panavision Int'l v. Toeppen,* 945 F.Supp. 1296 (C.D.Cal. 1996); *ActMedia, Inc. v. Active Media Int'l, Inc.,* No. 96–3448, 1996 WL 466527, at *1 (N.D.Ill. July 17, 1996); *see also Cardservice,* 950 F.Supp. at 741; *but see Interstellar,* 983 F.Supp. at 1331; *Juno Online Servs., L.P. v. Juno Lighting, Inc.,* 979 F.Supp. 684 (N.D.Ill.1997).

### 1. Service Mark Infringement Claim

The Complaint alleges the Defendant is liable for trademark infringement pursuant to 15 U.S.C. § 1114 ("Section 1114") because he is using the Mark in his domain name. Section 1114 of states, in relevant part,

(1) Any person who shall, without the consent of the registrant-

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive. . . .

15 U.S.C. § 1114.

■ In order for a party to prevail on a claim of trademark [18] or service mark [19] infringement under Section 1114 and the common law, the party must establish that (1) the mark is valid and legally protectable, (2)

---

**18.** A "trademark" is defined as
> any word, name, symbol, or device, or any combination thereof-
> (1) used by a person, or
> (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter, to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

15 U.S.C. § 1127.

**19.** A "service mark" is defined as
> any word, name, symbol, or device, or any combination thereof-
> (1) used by a person, or
> (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter, to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown.

15 U.S.C. § 1127.

the mark is owned by the plaintiff and (3) use of the same mark by the defendant is likely to create confusion among the relevant consumers. *See Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir.1994); *Ford Motor Co. v. Summit Motor Prods. Inc.*, 930 F.2d 277, 291 (3d Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *Opticians*, 920 F.2d at 192 (citing *Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.*, 656 F.Supp. 449, 453 (D.N.J. 1987)); *One World Botanicals Ltd. v. Gulf Coast Nutritionals, Inc.*, 987 F.Supp. 317, 331 (D.N.J.1997); *Genovese*, 939 F.Supp. at 343; *FM 103.1*, 929 F.Supp. at 194 (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc. .*, 589 F.2d 1225, 1228 (3d Cir.1978); *Birthright v. Birthright, Inc.*, 827 F.Supp. 1114, 1135–37 (D.N.J.1993)).

### a. *Validity and Legal Protectability of the Mark*

It appears the Mark has become incontestable pursuant to Section 1065.[20] *See* Complaint ¶ 16; Exhibit A to Coleman Aff. Once a mark becomes incontestable, the registration of that mark is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115. In order to challenge the validity of an incontestable mark in an infringement action, only certain defenses or defects, none of which have been raised in this case, can be asserted. *See id.* Because the Mark was registered and appears to be incontestable, the validity and legal protectability of the Mark has been established. *See Fisons*, 30 F.3d at 472; *Ford Motor Co.*, 930 F.2d at 292.

As mentioned, the Defendant does not challenge the validity or legal protectability of the Mark but rather argues that his domain name does not infringe upon the Mark because the domain name does not contain a letter "O" that is stylized as a "✡".[21] *See* Defendant Brief at 4, 12. The central issue, therefore, is whether the Plaintiff has rights to the phrase "Jews for Jesus" even though the letter "O" is not depicted as a "✡".

### (1) *Federally Registered* [22] *Service Mark*

The Defendant acknowledges that, because of technical reasons, domain names cannot

---

**20.** Section 1065 states, in relevant part, that

Except ... the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable: Provided, That-

(1) there has been no final decision adverse to registrant's claim of ownership of such mark for such goods or services, or to registrant's right to register the same or to keep the same on the register; and

(2) there is no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of; and

(3) an affidavit is filed with the Commissioner within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce, and the other matters specified in paragraphs (1) and (2) of this section; and

(4) no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered....

15 U.S.C. § 1065.

**21.** The Defendant asserts that NSI would not recognize the challenge by the Plaintiff Organization to the domain name of the Defendant under NSI's Domain Name Dispute Policy, effective 25 February 1998, because the Policy states that "Trademarks incorporating a design will not be accepted." *See* 19 February Letter. This fact is not relevant to the issues discussed herein because the policy of NSI "cannot trump federal law." *Cardservice*, 950 F.Supp. at 740. "Holders of valid trademarks under federal law are not subject to [NSI's] policy, nor can the rights of those trademark holders be changed without congressional action." *See id.* "Anyone who obtains a domain name under [NSI's] ... policy must do so subject to whatever liability is provided for by federal law." *See id.*

**22.** Consumers are benefitted by the registration of a trademark "because such registration helps to prevent confusion about the source of products sold under a trademark and to instill in consumers the confidence that inferior goods are not being passed off by use of a familiar trademark." *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1395 (3rd Cir.1985), *cert. denied*, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985).

contain stylized letters. *See* Defendant Brief at 19 (stating it "is technically impossible for the word "F✡R", with the Star of David in the middle to be used in a domain name.") (emphasis in original). The Plaintiff, therefore, has no option but to use a domain name that does not contain a "✡" as a stylized letter "O". Accordingly, the only course for the Plaintiff Organization was to use a domain name that most resembles its Mark, either "jewsforjesus", or "jews_for_jesus" or "jews-for-jesus". For whatever reason, the Plaintiff chose to use the last option as its domain name. Simply because the Plaintiff chose not to use one or both of the other options, however, does not entitle the Defendant to use them as his own.

If the position of the Defendant were accepted, it would enable a party to use the mark of another where factors, outside the control of the party with the mark, make it impossible to adequately depict the mark. Because the Internet recognizes only certain types of characters (e.g., letters, dashes ("-"), underlines ("_")), those registered marks with unique characteristics, such as script lettering or symbols, would be fair game for anyone who wished to use such mark, but without the unique characteristic, as a domain name.

■ In order to constitute infringement, exact similarities are not required between the allegedly confusing marks. *See Fisons*, 30 F.3d at 477. Rather, it is sufficient that enough of the mark is confusingly similar or has been used to deceive the public. *See id.; Cardservice*, 950 F.Supp. at 741 (domain name dispute case stating "minor difference between the registered mark and the unauthorized use of the mark do not preclude liability ... when the unauthorized use is likely to cause confusion"); *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 33, 21 S.Ct. 7, 45 L.Ed. 60 (1900). Marks are confusingly similar if ordinary consumers are likely to conclude that they share a "common source, affiliation, connection or sponsorship." *Fisons*, 30 F.3d at 477.

■ Considering the domain name used by the Defendant is nearly identical to the Mark and the name of the Plaintiff Organization, it is likely that Internet users will conclude that the Mark, the name of the Plaintiff Organization and the domain name used by the Defendant share a "common source, affiliation, connection or sponsorship." As such, under the facts of this case, the phrase "jewforjesus" in the domain name used by the Defendant appears to be confusingly similar to the Mark.

### (2) *Common Law Service Mark*

The Complaint alleges the Plaintiff Organization has common law rights to the phrase "Jews for Jesus," *see, e.g.,* Complaint ¶¶ 8, 11–14, 16, 37–39, 47–49, 63, 70, 74 and 75, and it appears the Plaintiff Organization has a common law service mark for "Jews for Jesus."

■ "Common law rights are acquired in a service mark by adopting and using the mark in connection with services rendered." *Caesars World, Inc. v. Caesar's Palace*, 490 F.Supp. 818, 821 (D.N.J.1980) (citing *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916)); *Ford Motor Co.*, 930 F.2d at 289 (citing *Caesars World*, 490 F.Supp. at 821); *First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1044 (8th Cir.1996). Such rights "include the right to prevent the subsequent use by another person of the same or similar name or mark, when the business or service for which the name or mark is subsequently used, is likely to cause confusion as to the origin of the business or the services." *Caesars World*, 490 F.Supp. at 823. The extent of the protection afforded depends upon the distinctiveness of the mark itself. *See id.* at 821.

■ Service marks are often classified in the following categories, with the first category being the most distinctive and the last being the least distinctive: (1) fanciful, (2) arbitrary, (3) suggestive, (4) descriptive and (5) generic. *See Fisons*, 30 F.3d at 478; *Dranoff–Perlstein Assocs. v. Sklar*, 967 F.2d 852, 858–59 (3d Cir.1992); *FM 103.1*, 929 F.Supp. at 194 (citing *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). Fanciful, arbitrary and suggestive terms exhibit the greatest amount of distinctiveness and generally qualify for service mark protection. *See*

*id.* Generic terms, on the other hand, are not protectable. *See A.J. Canfield,* 808 F.2d at 297; *FM 103.1,* 929 F.Supp. at 194.

█ The Defendant argues the phrase "Jews for Jesus" is generic and therefore is not protectable. *See* Defendant Brief at 13–14. In the alternative, the Defendant argues the phrase is merely descriptive, and, thus is not protectable because the Plaintiff Organization has not established that the phrase has achieved a secondary meaning. *See id.* at 14–19.

### (i) *Distinctiveness of the Service Marks*

█ A term is "generic" if that term has "so few alternatives (perhaps none) for describing the good [or service] that to allow someone to monopolize the word would debilitate competitors." *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.,* 40 F.3d 1431, 1442 (3d Cir.1994). Generic words which cannot "individually become a trademark may become one when taken together." *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.,* 872 F.2d 1035 (D.C.Cir.1989) (citing *Union Carbide Corp. v. Ever–Ready Inc.,* 531 F.2d 366, 379 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976)).

In support of his position that the phrase "Jews for Jesus" is generic, the Defendant places heavy emphasis on the *Blinded Veterans* decision. In *Blinded Veterans,* the unregistered mark "blinded veterans" was found to be generic because the plaintiff organization repeatedly used that term to denote formerly sighted soldiers, not the organization itself. *See id.* at 1041. In so holding the court stated "[i]t is difficult to imagine another term of reasonable conciseness and clarity by which the public refers to former members of the armed forces who have lost their vision." *See id.* In addition, it was observed "blinded veterans simply designates the twice-circumscribed category of people who are both blinded and veterans." *See id.*

The facts of this case are distinguishable from those in *Blinded Veterans.* First, although the Plaintiff Organization sometimes refers to its members as "Jews" who are "for Jesus," during the past twenty-four years the Plaintiff Organization has consistently used the phrase "Jews for Jesus" to refer to the organization itself. *See, e.g.,* Exhibit 5 to Perlman Supplemental Aff.; Exhibits K–L to Coleman Aff. More importantly, there are several other names that could be used to refer to individuals of Jewish heritage who believe in Jesus, for example, "Messianic Jews," "Hebrew Christians," "Jews for Christ," or "Jews for Christianity." *See* Exhibit K to Coleman Aff., at ¶ 6. The use by the Plaintiff Organization of the phrase "Jews for Jesus" does not leave so few alternatives so as to monopolize the concept and debilitate potential competitors. *See Duraco Prods.,* 40 F.3d at 1442. The phrase is not generic. *See id.*

█ Unlike a generic mark, a descriptive mark "leaves a larger but finite set of equivalent alternatives, and therefore still can be protected (because there are adequate alternatives for competitors) but only if it has acquired secondary meaning." *See id.* "A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods [or services]." *A.J. Canfield,* 808 F.2d at 297.

█ When determining whether a mark is descriptive or suggestive, five factors should be considered: (1) the level of imagination required of potential customers in trying to cull a direct message from the mark about the quality or characteristics of the service; (2) whether the mark so closely tells something about the service that other sellers of similar services would likely want to use in connection with their services; (3) evidence other sellers are using this term to describe their products; (4) whether the mark conjures up some other, purely arbitrary connotation separate from what the mark conveys about the services; and (5) whether consumers are likely to regard the mark as a symbol of origin. *See FM 103.1,* 929 F.Supp. at 194–95 (citing *Trustco Bank,* 903 F.Supp. at 342; 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 11.21, 11.22 (3d ed. 1992) ("McCarthy on Trademarks")).

Application of these criteria to the phrase "Jews for Jesus" suggests the phrase is descriptive rather than suggestive because the

phrase does not require much imagination or thought to cull a direct message from the mark and the phrase does not conjure up a purely arbitrary connotation.

■ Descriptive marks are protectable if they acquire secondary meaning. *See Sklar,* 967 F.2d at 858; *FM 103.1,* 929 F.Supp. at 194–95 (citing *Two Pesos,* 505 U.S. at 769; *Birthright,* 827 F.Supp. at 1137). The burden of proving secondary meaning is on the party seeking protection of the mark. *See FM 103.1,* 929 F.Supp. at 194–95 (citing *Boston Beer v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 181 (1st Cir.1993); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1041 (2d Cir.1992)).

### (ii) *Secondary Meaning*

■ " 'Although there are numerous cases determining secondary meaning, there is no consensus on its elements.' " *Ford Motor Co.,* 930 F.2d at 292 (citations omitted). A non-exclusive list of factors which may be considered includes the extent of sales and advertising leading to buyer association, the fact of copying, customer testimony, the use of the mark in trade journals, the size of the company, the number of customers and actual confusion. *See id.* Other factors include (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the services and the mark, (4) sales success, (5) attempts to plagiarize the mark and (6) the length and exclusivity of the use of the mark. *See Sklar,* 967 F.2d at 858–59; *FM 103.1,* 929 F.Supp. at 194–95 (citing *Centaur Communications v. A/S/M Communications,* 830 F.2d 1217, 1222 (2d Cir.1987); *Trustco Bank,* 903 F.Supp. at 342).

■ Secondary meaning is demonstrated when the primary significance of the term in the minds of the consuming public is not the product but the producer. *See FM 103.1,* 929 F.Supp. at 194–95 (citing *Scott Paper,* 589 F.2d at 1228; *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 815 F.2d 8, 10 (2d Cir.1987)).

Application of these factors to this case indicates the phrase "Jews for Jesus" appears to have acquired a secondary meaning.

First, the Plaintiff Organization has expended a considerable amount of money on advertising. *See supra,* note 10; *see also* Perlman Amended Aff. ¶¶ 9–10. Since 1988, the Plaintiff Organization has expended an average of $497,679.70 per year on advertising. *See* Exhibit 1 to Perlman Supplemental Aff. The Defendant acknowledges the success of these efforts, stating:

> I was seeing their ads all over the place on the subways and in the newspapers with their obscene messages, and I noticed they were heavily promoting their websites....

*See* Complaint ¶ 42 (citing 9 January 1998 *Jewish Week* article).

Second, the Plaintiff Organization has received extensive media coverage in connection with its teachings and mission. *See* Perlman Amended Aff. ¶ 12; Exhibits 2–3 to Perlman Amended Aff.; *see also* Exhibit I and K to the Complaint. It appears that, since 1992, more than 857 news articles have been written about the Plaintiff Organization and more than 2300 Web site pages contain some discussion of the Plaintiff Organization. *See supra,* note 11; Complaint ¶ 18. In addition, representatives of the Plaintiff Organization have appeared on numerous radio and television programs. *See* Perlman Amended Aff. ¶ 12. Furthermore, it appears the Plaintiff Organization has distributed more than 35,000,000 pamphlets in public venues throughout the United States. *See* Perlman Amended Aff. ¶ 4; *see also supra,* note 11.

Third, the Plaintiff Organization has been successful in its marketing efforts and maintains a data base in excess of one million addresses of individuals to whom mailings are sent. *See* Perlman Supplemental Aff. ¶ 5; *see also supra,* note 11.

Fourth, the Plaintiff Organization and/or its predecessor organizations appear to have used the mark continuously since 1973 when the Plaintiff Organization was incorporated. *See* Perlman Amended Aff. ¶ 4; Plaintiff Reply Brief at 2 n.1.

The Plaintiff Organization appears to have demonstrated that the phrase "Jews for Jesus" is a common law mark because it has acquired a secondary meaning in the minds of the public. The primary significance of

the phrase "Jews for Jesus" is not merely the beliefs of messianic Jews generally but the identification of the Plaintiff Organization and, as such, its teachings and message.

The Plaintiff Organization appears not only to have a valid and protectable federally registered service mark but also appears to have a valid and protectable common law service mark (the common law service mark will be referred to as the "Name of the Plaintiff Organization").

b. *Ownership of the Mark and the Name of the Plaintiff Organization*

■ The party asserting ownership of a mark must make a showing of clear entitlement to it. *See Natural Footwear,* 760 F.2d at 1397. The Defendant contends the Plaintiff Organization does not, and cannot, own rights to the phrase "Jews for Jesus". As explained, however, under the facts of this case, the ownership by the Plaintiff of the Mark may be expanded to include the phrase "Jews for Jesus" for Internet use because there is no adequate way to depict the Mark as a domain name. As discussed, the Plaintiff Organization also appears to have common law rights to the phrase "Jews for Jesus." Because it appears the Plaintiff owns the Mark and the Name of the Plaintiff Organization, it is entitled to the rights associated with each.

■ The Defendant argues that, even if the Mark is owned by the Plaintiff, it may be used in connection with only those kinds of materials designated in the federal registration. *See* Defendant Brief at 19–20; the 16 February Letter. The registration indicates the Mark falls within Class 16 [23] and is for "Religious Pamphlets." *See* Exhibit A to the Complaint, at 2. The Defendant asserts,

therefore, that the Plaintiff cannot expand the registration to include the use of the Mark on the Internet because the scope of registration is limited to "religious pamphlets." *See* Defendant Brief at 19–20; 16 February Letter. Moreover, the Defendant contends that, in order for the Mark to be protected in connection with use on an Internet site, it needs to have been registered in International Classification 42 [24] ("Class 42"). *See* Defendant Brief at 20 n.9. Because the Mark is not classified in that manner and this action involves the use of a domain name and not "religious pamphlets," the Defendant asserts he may use the phrase "Jews for Jesus" in his domain name. *See id.*

In support of his position, the Defendant relies on *Natural Footwear,* 760 F.2d 1383. In *Natural Footwear,* the registration issued to the plaintiff by the PTO indicated the trademark at issue was to be used for "FOOTWEAR—NAMELY, SHOES, SLIPPERS AND BOOTS." *See id.* at 1396–97. The Circuit held that, because the complaint sought relief based on the federal registration of the trademark, the plaintiff was only entitled to relief under federal trademark law in regard to its marketing of footwear, not accessories and clothing. *See id.* In so holding, the court stated the purpose of the trademark law

is best served by limiting the impact of a registered mark to only the specific terms of the registration so as to allow parties interested in marketing products with a new mark to rely as fully as possible on the registry. This rule . . . will appropriately encourage registrants who wish to receive the full scope of the [Lanham] Act's protection in regard to the new use of the mark to file a new application cover-

---

**23.** Class 16 provides as follows:

16. Paper and paper articles, cardboard and cardboard articles; printed matter, newspaper and periodicals, books; bookbinding material; photographs; stationery, adhesive materials (stationery); artists' materials; paint brushes; typewriters and office requisites (other than furniture); instructional and teaching material (other than apparatus); playing cards; printers' type and cliches (stereotype).

37 C.F.R. § 6.1 (1998).

**24.** Class 42 provides as follows:

The service of: (1) Providing multiple-user access to a global computer information network for the transfer and dissemination of a wide range of information; or, (2) Leasing or providing access time to computer data bases/web sites/home pages of others in the field(s) of [indicate specific field(s) or subject matter ] by means of a global computer network, is classified in International Class 42.

*Identification and Classification of Certain Computer Related Goods and Services* (visited 5 March 1998) <http://www.uspto.gov/web/offices/tac/domain/domcl.html>.

ing the new products and making reference to the earlier registration once they begin to sell a new line of products under their registered mark.

*Id.* at 1396.[25] McCarthy on Trademarks explains that the classifications in a trademark registration are "only for the administrative convenience of the PTO and neither limit nor extend the scope of protection of the registered mark." 3 McCarthy on Trademarks, § 24:66, at 24–115. As such, this treatise argues that "[t]he fact that the infringer's goods fall within a different classification from the registrant's goods is not determinative of a likelihood of confusion." *See id.*

*Natural Footwear* is not applicable to this case because, unlike in *Natural Footwear,* the category of goods the Plaintiff Organization seeks to protect is identical to those listed in the Registration, i.e., "Religious Pamphlets." The Plaintiff Organization Internet site contains, among other things, electronic versions of many of its pamphlets and publications, none of which can be downloaded. *See* Perlman Amended Aff. ¶ 17; Plaintiff Reply Brief at 10. The use of the

Mark in connection with Plaintiff Organization Internet site is not an attempt by the Plaintiff to expand the scope of the Registration, but rather is a natural extension of it in view of the new technology of the Internet. As such, it is properly categorized in Class 16.[26]

■ The contention advanced by the Defendant that the Mark should have been registered in Class 42 is also without merit. According to the PTO, Class 42

covers those services provided by entities such as America OnLine®, Prodigy® and CompuServe®. They provide the computer service (often using the telecommunications services of other entities as described above in Class 38) that enable computer users to access data bases and home pages of others. These entities are considered "link providers" in that they provide the computer/server connection required for computer users to access a content provider. *The word "access" should be limited to these services and should not be used in describing the service of a content provider.*

---

**25.** McCarthy on Trademarks has criticized the *Natural Footwear* decision stating

[i]n a confused and internally inconsistent opinion, the Third Circuit said at one point that the 'impact' of a registered mark should be limited 'to only the specific items of the registration.' It is not clear whether the court meant limiting the presumptive *validity* of the mark (which is the law), or limiting infringement remedies to only defendant's goods which are identical to those in the plaintiff's registration (which is not the law anywhere.).

3 McCarthy on Trademarks, § 24:65 at 24–114 n.3.; *see also E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525 (11th Cir.1985) (remedial rights of an owner of a registered mark are extended to any goods which are likely to cause confusion, and not just limited to the goods in the registration). Nevertheless, *Natural Footwear* remains the law of this Circuit.

**26.** There appears to be a gap in the classification of certain trademarks. The PTO states

[o]nly hard copy publications, e.g., printed magazines and books, are considered to be Class 16 goods.... *Magazines or books that are downloadable from a computer network are not considered to be "hard goods" and they are classified in International Class 42 rather than Class 16.*

*Identification and Classification of Certain Computer Related Goods and Services* (visited 5 March

1998) <http://www.uspto.gov/web/offices/tac/domain/domcl.html>. (emphasis added). Class 42, however, does not apply to a "content provider." *Id.* The question arises then within what classification does a "content provider" fall if that provider offers books, magazines or pamphlets that are not downloadable. The PTO indicates that such information "should be classifiable according to the information provided." Specifically, the PTO has stated:

Most applicants will be "content" providers who furnish information via the Internet, i.e., offer the service of providing information. *In such cases, the service offered is an information service classifiable according to the information provided,* e.g., a service that offers business information is classified in Class 35, a service that offers financial information is classified in Class 36, and a service that offers building construction, repair or maintenance information is classified in Class 37.

*Trademark Examination of Domain Names* (last modified 16 January 1998) <http://www.uspto.gov/web/offices/tac/domain/tmdomain.htm> (emphasis added). In this case, the "services" to be provided are religious in nature. None of the classifications expressly cover such service. *See* 37 C.F.R. § 6.1 (1998). As such, it appears appropriate to classify the services provided in the category which most closely resembles the "products" used by the service, i.e., Class 16.

*Identification and Classification of Certain Computer Related Goods and Services* (visited 5 March 1998) <http://www.uspto.gov/web/offices/tac/domain/domcl.html> (emphasis added). The PTO defines a "content provider" as a party "who furnishes information via the Internet, i.e., offer[s] the service of providing information." *Trademark Examination of Domain Names* (last modified 16 January 1998) <http://www.uspto.gov/web/offices/tac/domain/tmdomain.htm>. In this case, the Plaintiff Organization is a "content provider" and therefore does not qualify for registration in Class 42. *See id.*

■ Even if the *Natural Footwear* holding were applicable to this case and the Plaintiff Organization should have registered the Mark in Class 42, it would not affect the common law rights of the Plaintiff Organization to prevent the use by the Defendant in his domain name of the name of the Plaintiff Organization. As stated in *Natural Footwear:*

> The discussion of *the scope of rights flowing from federal registration must not be read to apply as well to common law rights in a trademark.* These latter rights are based on the actual use of a product in an area and, as we discuss infra, are not necessarily limited to the product originally identified by the trademark. *Rather, protection from the date of the first use of the mark may extend to related products that are later sold under the common law mark.*

*Natural Footwear*, 760 F.2d at 1396 n. 27 (emphasis added). The common law rights of the Plaintiff Organization encompass more than "religious pamphlets" because it has used the phrase "Jews for Jesus" for more than twenty-four years as its trade name, on billboards, news letters, publications, radio programs, etc. *See, e.g.,* Perlman Amended Aff. ¶¶ 8–10, 12.

Based on the foregoing, the Plaintiff Organization appears to be the owner of the Mark and the Name of the Plaintiff Organization.

#### c. *Likelihood of Confusion*

■ To prevail on a claim for infringement, the Plaintiff Organization need demonstrate only a likelihood of confusion, not proof of actual confusion. *See AT&T Co.,* 42 F.3d at 1442; *Fisons,* 30 F.3d at 473 (quoting *Ford Motor Co.,* 930 F.2d at 292). A likelihood of confusion exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Ford Motor Co.,* 930 F.2d at 292 (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978)).

■ In determining whether a likelihood of confusion exists, the following factors (the "Scott Factors") should be considered:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of the public because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market.

*Scott Paper,* 589 F.2d at 1229; *see Fisons,* 30 F.3d at 473. In this case, the majority of relevant factors indicate a likelihood of confusion exists.

### (1) *Similarity of the Mark, the Name of the Plaintiff Organization and the Defendant Internet Site*

■ The degree of similarity of the marks usually is the most important of the

Scott Factors. *See Fisons,* 30 F.3d at 476. Where an infringer uses the exact mark of the holder of a mark, a great likelihood of confusion exists. *See S & R. Corp.,* 968 F.2d at 375. Similarly, "if the overall impression created by [the] marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" *Opticians,* 920 F.2d at 195. "'Where the trademark owner and alleged infringer deal in competing goods or services, the court need rarely to look beyond the mark itself.'" *Securacomm Consulting, Inc. v. Securacom Inc.,* 984 F.Supp. 286, 299 (D.N.J.1997) (citing *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir. 1983)). When examining the confusing similarity of two marks, the overall impression of the marks, not their individual component parts, must be taken into account. *See Genovese,* 939 F.Supp. at 346.

As mentioned, the Mark is "Jews f☼r Jesus," the common law service mark is "Jews for Jesus", while the domain name used by the Defendant is "jewsforjesus". The only difference between the Mark and the domain name of the Defendant, therefore, is the fact that spaces are omitted from the Defendant's domain name and the letter "O" replaces the "☼"; other than the absence of capitalization and a space between the words, the domain name of the Defendant is identical to the Name of the Plaintiff Organization. These minor differences are necessary for the domain name used by the Defendant to be functional and do not alleviate the likelihood of confusion between the marks.

The Defendant argues that his domain name is not too similar to the Mark because "[u]nlike competing products on a grocery store shelf wearing confusingly similar trade dress, in the digital world of computers one either lands on the desired website or not." Defendant Brief at 21. The Defendant then makes the unsupportable leap in logic that "[s]imilarity, then, is not shown." *Id.* at 22.

On their face, the Mark, the Name of the Plaintiff Organization and the domain name of the Defendant are virtually identical. As observed in *Planned Parenthood,*

> defendant's use of plaintiff's mark is ... likely to prevent some Internet users from reaching plaintiff's own Internet web site.

Prospective users of plaintiff's services who mistakenly access defendant's web sit . may fail to continue to search for plaintiff's own home page, due to anger, frustration, or the belief that plaintiff's home page does not exist.

*Planned Parenthood,* 1997 WL 133313, at *4.

The Plaintiff has established that the domain name used by the Defendant is substantially similar to the Mark and the Name of the Plaintiff Organization, which similarity increases the likelihood of confusion among Internet users. *See, e.g., id.* at *8 (finding similarity between trademark and offending domain name where only differences were that domain name did not contain spaces and contained initial capitalization); *Hasbro,* 1996 WL 84853, at *1 (finding similarity between mark "CANDY LAND" and domain name "candyland.com" even though domain name did not contain spaces or capitalization); *Playboy,* 985 F.Supp. at 1221 (finding similarity between domain names "Playboyxxx" and "Playmatelive" where marks were "Playboy" and "Playmate"); *Cardservice,* 950 F.Supp. at 741 (finding similarity between trademark "Cardservice International" and domain name "cardservice.com"). "To stress a point made several times already, the [domain name of the Defendant] and the [Mark and the Name of the Plaintiff Organization] are almost identical. This fact alone gives rise to a strong inferrence [sic] of confusion." *Ford Motor Co.,* 930 F.2d at 297.

### (2) *Strength of the Mark and the Name of the Plaintiff Organization*

The term "strength," as applied to trademarks or service marks, refers to the commercial strength or marketplace recognition of the mark, as well as the distinctiveness of the mark. *Fisons,* 30 F.3d at 479; *Genovese,* 939 F.Supp. at 346 (citation omitted).

The Defendant argues that the phrase "Jews for Jesus" is either generic, and therefore not entitled to protection, or descriptive and therefore entitled to only the weakest protection. *See* Defendant Brief at 22. As mentioned, however, the Mark has become incontestable. Accordingly, the Defendant cannot argue that the Mark is descriptive or

that it lacks secondary meaning because it is conclusively presumed that the Mark either is non-descriptive, or if descriptive, has acquired secondary meaning. *See Ford Motor Co.*, 930 F.2d at 292; *see also Park 'N Fly, Inc. v. Dollar Park and Fly*, 469 U.S. 189, 205, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

The Name of the Plaintiff Organization appears to have achieved a secondary meaning. The Name of the Plaintiff Organization and the Mark have been used for many years and have been extensively advertised. The Plaintiff Organization has advertised heavily and disseminated data through magazines, brochures, newspapers and the Internet in the United States and abroad. *See* Perlman Amended Aff. ¶ 8. In addition, the Plaintiff Organization has conducted an annual advertising campaign since 1982 in national publications such as the *New York Times*, the *Washington Post*, the *Wall Street Journal*, *Newsweek*, *Parade*, and *TV Guide*. *See id.* ¶ 14. These campaigns have had a price tag of almost $500,000 per year. *See supra*, note 10. In addition, the Plaintiff Organization has distributed more than 35,000,000 pamphlets in public venues throughout the United States. *See* Perlman Amended Aff. ¶ 14; *see also supra*, note 11.

The advertising efforts of the Plaintiff have apparently paid off. It appears that, since 1992, more than 857 news articles and 2300 Web site pages of discussion have been written about the Plaintiff Organization. *See supra*, note 11. The Defendant has not disputed the contention that the Plaintiff Organization has received extensive media coverage. Indeed, the Defendant has stated:

> I was seeing their ads all over the place on the subways and in the newspapers with their obscene messages, and I noticed they were heavily promoting their websites. . . .

*See* Complaint ¶ 42 (citing 9 January 1998 *Jewish Week* article). There appears little doubt that the Name of the Plaintiff Organization and the Mark are strong.

### (3) *Level of Sophistication of Internet Users*

█ "It is well-established that likelihood of confusion 'should be determined by viewing the two marks from the perspective of an ordinary consumer of the goods or services.'" *Ford Motor Co.*, 930 F.2d at 293. The Defendant appears to argue that, if Internet users are able to access his Internet site, then those users are sophisticated enough to realize that his Internet site is not affiliated with the Plaintiff Organization. *See* Defendant Brief at 22. This argument ignores the fact that an individual may be a sophisticated user of the Internet but may be an unsophisticated consumer of information about religious organizations. Such a user may find his or her way to the Defendant Internet site and then may be confused; the Defendant Internet site advocates views antithetical to those of the Plaintiff Organization. *See Green Products*, 992 F.Supp. at 1077 (stating that use of plaintiff's trademark as defendant's domain name is likely to cause confusion as to who owns Internet site much like if store had competitor's name on it). The Disclaimer does not alleviate this problem.

As observed by the court in *Planned Parenthood*, "[d]ue to the nature of Internet use, defendant's appropriation of plaintiff's mark as a domain name and home page address cannot adequately be remedied by a disclaimer." *Planned Parenthood*, 1997 WL 133313, at *12. In addition, considering the vastness of the Internet and its relatively recent availability to the general public, many Internet users are not sophisticated enough to distinguish between the subtle difference in the domain names of the parties. *See Green Products*, 992 F.Supp. at 1078 (finding Internet users do not undergo a highly sophisticated analysis when searching for domain names). Unlike the disputed Internet sites in *Teletech* and *Interstellar* which contained information completely different from the services offered by the trademark owner, in this case the information provided by the Defendant is related to the information disseminated by the Plaintiff Organization. Accordingly, unlike in *Teletech* and *Interstellar*, a reading of the Defendant Internet site will not eliminate the likelihood of confusion between the Defendant Internet site and the Mark and/or the Name of the Plaintiff Orga-

nization. This is the so even with the addition of the Disclaimer.[27]

### (4) Length of Time the Defendant has Used the Mark or the Name of the Plaintiff Organization Without Causing Confusion

The Defendant Internet site became operational in mid-to-late December 1997. *See* Brodsky Certif. ¶ 1. The Plaintiff Organization submitted three affidavits which state the affiants became confused on 15, 16 and 18 January 1998, when they inadvertently accessed the Defendant Internet site while attempting to access the Plaintiff Organization Internet site. *See* Chellathurai Amended Aff. ¶ 4; Sanchez Aff. ¶ 6; Kalstein Aff. ¶ 5.

The Defendant contends the Plaintiff Organization has not submitted competent evidence on the issue of how long the Defendant has used his Internet site without causing confusion. Specifically, the Defendant argues that the affidavits submitted by the Plaintiff are self-serving because the individuals who submitted them are supporters of the Plaintiff Organization. The Defendant has offered nothing to contest the reliability or accuracy of these affidavits. Moreover, the Defendant has offered nothing to establish that his domain name and/or Internet site is not confusing.

Notwithstanding the assertions of the Defendant, actual confusion appears to have been caused shortly after the Defendant Internet site went into operation. If supporters of the Plaintiff Organization were confused by the domain name used by the Defendant and his Internet site then, in all likelihood, individuals who are not familiar with the views of the Plaintiff Organization also have been and will continue to be confused. Moreover, the domain name used by the Defendant is virtually identical to the domain name used by the Plaintiff Organization.

### (5) The Intent of the Defendant in Using the Mark and the Name of the Plaintiff Organization

The Defendant has been publicly vocal about his intent and purpose in registering and using his domain name. As mentioned, the Defendant characterized his Internet site as a "bogus 'Jews for Jesus'" site and stated the intent of this site is to "intercept potential converts" to the beliefs of the Plaintiff Organization. *See* Exhibit J to the Complaint. The Defendant also stated he intended to use "deceit and trickery" to direct persons to his Internet site. *See* Exhibit 3 to Perlman Amended Aff. These statements demonstrate the actions by the Defendant were wilful and undertaken in bad faith, with full knowledge of and the intent to cause confusion and to infringe on the rights of the Plaintiff Organization. *See Green Products,* 992 F.Supp. at 1078 (stating deceptive use of another's trademark in domain name to lure customers away from competitor is kind of consumer confusion). The Defendant is not only appropriating the Name of the Plaintiff Organization and the Mark but also is using them to leach off the extensive efforts the Plaintiff Organization has undertaken during the past twenty-four years to give currency to its name and to disseminate its teachings.

The intent of the Defendant is similar, if not identical, to the conduct the *Planned Parenthood* court found to be wilful infringement. Like the defendant in *Planned Parenthood,* the Defendant has "demonstrated full knowledge of plaintiff's name and activities," and has admitted to an understanding that using the Mark or the Name of the Plaintiff Organization as his domain name would attract viewers to his Internet site "because of their misapprehension as to the site's origin." *Planned Parenthood,* 1997 WL 133313, at *9.

### (6) Manner in Which Marketed

Both the Plaintiff and the Defendant use the Name of the Plaintiff Organization in their domain names and both domain names can be accessed from any Internet browser. Accordingly, both are marketed in the same manner—i.e., through the Internet. *See,*

---

**27.** At the 13 February Hearing, it was observed the Defendant Internet site did not contain a hyperlink to the Plaintiff Organization Internet site. In the 16 February Letter, counsel for the Defendant indicated that such a hyperlink would violate the religious beliefs of the Defendant by rendering "assistance to plaintiff's missionary efforts." 16 February Letter, at 2.

*e.g., Planned Parenthood,* 1997 WL 133313, at *8; *Interstellar,* 983 F.Supp. at 1336.

### (7) *Audience to Which Marketed*

The Defendant contends his Internet site is designed to reach only potential Jewish apostates, not gentiles. *See* Defendant Brief at 26–27. Accordingly, he argues the audience for his Internet site is different from the audience for the Plaintiff Organization Internet site, which seeks to attract persons of any religious persuasion who are interested in "Jews for Jesus". *See id.*

This assertion is curious, at best. The audience for both the Plaintiff Organization and the Defendant Internet sites are those individuals using the Internet to find information about the teachings of the Plaintiff Organization. Accordingly, the audience both parties seek is identical. *See, e.g., Planned Parenthood,* 1997 WL 133313, at *8 (finding both parties were competing for same audience—"namely Internet users who are searching for a web site that the plaintiff's mark as its address"); *Playboy,* 985 F.Supp. 1220, at 1221 (finding both parties competing for market of individuals searching for "Playboy"); *Juris,* 1996 WL 376600 at *1 (finding both parties competing for same target audience—lawyers and law firms).

The Plaintiff Organization has demonstrated a likelihood of success on its claim of federal and common law service mark infringement.

### 2. *Federal Dilution Claim Under 15 U.S.C. § 1125(c)*

 Count I of the Complaint alleges trademark dilution pursuant to 15 U.S.C. § 1125(c)[28] ("Section 1125(c)"). Section 1125(c) entitles an owner of a trademark to injunctive relief if the mark is "famous" and use by another party of that mark "in commerce" causes dilution of the distinctive quality of the mark. *See* 15 U.S.C. § 1125; *S Industries, Inc. v. Diamond Multimedia Systems, Inc.,* 991 F.Supp. 1012, 1020 (N.D.Ill.1998) (stating under federal dilution act plaintiff must show mark is famous and defendant's use of same or similar mark creates a likelihood of dilution through tarnishment or blurring). The owner of a famous mark is also entitled to monetary damages where the person against whom the injunction is sought "willfully intended to trade on the owner's reputation or to cause dilution of the famous mark."[29] *See* 15 U.S.C. § 1125. In order to succeed on a dilution claim, the plaintiff need not demonstrate a likelihood of consumer confusion. *See Genovese,* 939 F.Supp. at 349. All that needs to be proven is that the mark is famous and the use by the offending party of the mark is commercial and in commerce. *Intermatic,* 947 F.Supp. at 1238. The mark may be either a common law mark or federally-registered one. *See id.* at 1237.

The purpose of the dilution law is to protect "distinctive" or "famous" trademarks from certain unauthorized uses of the marks regardless of a showing of competition or likelihood of confusion. *See Genovese,* 939 F.Supp. at 349; *Panavision,* 945 F.Supp. at 1301.

### a. *The Mark and the Name of the Plaintiff Organization are Famous*

In determining whether a mark is distinctive and famous, a court may consider the following factors:

> (2) In an action brought under this subsection, the owner of the famous mark shall be entitled only to injunctive relief unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of the famous mark shall also be entitled to the remedies set forth in sections 1117(a) and 1118 of this title, subject to the discretion of the court and the principles of equity.
> 28 U.S.C. § 1125(c)(2).

---

**28.** Section 1125(c) states, in relevant part, as follows:

(c) Remedies for dilution of famous marks

(1) The owner of a *famous mark* shall be entitled ... to an injunction against another person's *commercial use in commerce* of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125 (emphasis added).

**29.** Section 1125(c)(2) states

(1) the degree of inherent or acquired distinctiveness of the mark;

(2) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(3) the duration and extent of advertising and publicity of the mark;

(4) the geographical extent of the trading area in which the mark is used;

(5) the channels of trade for the goods or services with which the mark is used;

(6) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(7) the nature and extent of use of the same or similar marks by third parties; and

(8) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125; *Genovese*, 939 F.Supp. at 349. The Defendant contends the Plaintiff has not shown that the Mark or the Name of the Plaintiff Organization is entitled to protection, or that the Mark or the Name of the Plaintiff Organization is famous. *See* Defendant Brief at 29. A consideration of the above factors, however, indicates otherwise. *See Teletech*, 977 F.Supp. at 1413; *Panavision*, 945 F.Supp. at 1302–03.

■ The Name of Plaintiff Organization has been used by the Plaintiff for more than twenty-four years and has been publicized worldwide in the media. *See* Perlman Amended Aff. ¶ 5; *see also supra*, note 11. The Mark has been registered and used since 1983. The Plaintiff Organization has expended a considerable amount of money on advertising to publicize its name and its message.

*See supra*, note 10. The Mark and the Name of the Plaintiff Organization have come to identify one organization—the Plaintiff. Media coverage has been extensive, and, as the Defendant has himself explained, the advertisements by the Plaintiff Organization have been "all over the place"—on the subways and the newspapers. As well, the Plaintiff has extensively promoted its Web site. Moreover, there does not appear to be a mark in use by a third party that is the same as or similar to the Mark or the Name of the Plaintiff Organization. All of the examples cited by the Defendant of other entities that use the mark "Jews for Jesus" or the Name of the Plaintiff Organization either are or were owned by Plaintiff or its predecessors and/or affiliates. *See* Plaintiff Reply Brief at 2 n.1. Finally, the Mark is incontestable.

b. *The Use by the Defendant of the Mark and the Name of the Plaintiff Organization Causes Dilution*

■ The term "dilution" is defined as the "lessening of the capacity of a famous mark to identify and distinguish goods or services" and encompasses traditional state law doctrines of blurring [30] and tarnishment.[31] *See* 15 U.S.C. § 1127; *see also Intermatic*, 947 F.Supp. at 1240; *Panavision*, 945 F.Supp. at 1304.

■ The Defendant contends the Plaintiff has not shown that his Internet page will dilute the value of the Mark or the Name of the Plaintiff Organization. This contention is without merit. In *Intermatic*, the defendant had diluted the plaintiff's mark solely by virtue of his use of the mark on his Internet site, even though the site contained nothing more than a map, and did not contain any material concerning the products of plaintiff. The court stated:

---

**30.** "Blurring" occurs when the selling power and value of a mark is whittled away by the unauthorized use of the mark. *Panavision*, 945 F.Supp. at 1304. This occurs where a prospective customer sees the plaintiff's mark used by other persons to identify different sources of different goods and services, thus weakening the distinctive significance of the mark to identify and distinguish the source. 3 McCarthy on Trademarks on Trademarks and Unfair Competition, § 24:94, at p. 24–160 (4th ed.1997).

**31.** "Tarnishment" arises where a party's unauthorized use of a famous mark is linked to products of poor quality or is portrayed in an unwholesome manner and therefore degrades the positive associations and the distinctive quality of the mark. *Panavision*, 945 F.Supp. at 1304; 3 McCarthy on Trademarks, § 24:95, at 24–165.

[I]f [defendant] were allowed to use "intermatic.com", Intermatic's name and reputation would be at [defendant's] mercy and could be associated with an unimaginable amount of messages on [defendant's] web page.... Attaching Intermatic's name to a myriad of possible messages ... is something that the [Lanham] Act does not permit.

*Intermatic*, 947 F.Supp. at 1240.

In this case, the Defendant is using the Mark and the Name of the Plaintiff Organization to lure individuals to his Internet site where he makes disparaging statements about the Plaintiff Organization. His site then refers these individuals, via a hyperlink, to the Internet site maintained by the Outreach Judaism Organization which also contains information critical of and contrary to the teachings of the Plaintiff Organization. Such conduct amounts to "blurring" and "tarnishment" of the Mark and the Name of the Plaintiff Organization. *See Panavision*, 945 F.Supp. at 1304.

In *Planned Parenthood*, it was found the conduct of the defendant caused dilution where he was using the plaintiff mark as his domain name and was advancing views contrary to those of the plaintiff. *See Planned Parenthood*, 1997 WL 133313, at *6; *see also Hasbro*, 1996 WL 84853, at *1.

In this case, the use by the Defendant in his domain name of the Mark and the Name of the Plaintiff Organization has resulted in not only the loss of control over the Mark and the Name of the Plaintiff Organization, but also in the reality that views directly contrary to those of the Plaintiff Organization will be disseminated through the unauthorized use of the Mark and the Name of the Plaintiff Organization. As such, irreparable harm has resulted

because [the use of the Mark and the Name of the Plaintiff Organization] is likely to prevent some Internet users from

reaching plaintiff's own Internet web site. Prospective users of plaintiff's services who mistakenly access defendant's sit[e] may fail to continue to search for plaintiff's own home page, due to anger, frustration or the belief that plaintiff's home page does not exist.

*Planned Parenthood*, 1997 WL 133313, at *4. Dilution of the Mark and the Name of the Plaintiff Organization, therefore, has been demonstrated.

c. *The Use by Defendant of the Mark and the Name of the Plaintiff Organization Constitutes Commercial Speech*

The Defendant contends his conduct is exempted from the dilution law because it is "non-commercial speech." *See* Defendant Brief at 30 (quoting 28 U.S.C. § 1125(c)(4) ("Section 1125(c)(4)")).[32] Specifically, the Defendant claims his speech is non-commercial because "it is meant to call attention to issues of public importance." *Id.* at 32.

"The non-commercial use of a domain name that impedes a trademark owner's use of that domain name does not constitute dilution" because such use is excluded from Section 1125(c). *Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F.Supp 949, 959 (C.D.Cal.1997); *see* 28 U.S.C. § 1125(c)(4). As such, the mere registration of a domain name, without more, is not a "commercial use" of a trademark. *See, e.g., Academy of Motion Picture Arts and Sciences*, 989 F.Supp. 1276, 1278; *Juno*, 979 F.Supp. at 691; *Panavision*, 945 F.Supp. at 1303. "The exception for non-commercial use of a famous mark is intended to prevent courts from enjoining constitutionally protected speech. That is, the exclusion encompasses conduct such as parodies and consumer product reviews." *Panavision*, 945 F.Supp. at 1303.

In *Planned Parenthood*, the use by the defendant of the plaintiff's mark was found to

---

**32.** Section 1125(c)(4) states

The following shall not be actionable under this section:

(A) Fair use of a famous mark by another person in comparative advertising or promotion to identify the competing goods or services of the owner of the famous mark.

(B) *Noncommercial use of a mark.*

(C) All forms of news reporting and news commentary.

28 U.S.C. § 1125(c)(4) (emphasis added).

be "commercial" for three reasons: (1) the defendant was engaged in the promotion of a book, (2) the defendant was a non-profit political activist who solicited funds for his activities, and (3) the defendant's actions were designed to harm the plaintiff commercially. *See Planned Parenthood,* 1997 WL 133313, at *5. In so finding, the court stated:

> [D]efendant has appropriated plaintiff's mark in order to reach an audience of Internet users who want to reach plaintiff's services and viewpoint, intercepting them and misleading them in an attempt to offer his own political message. Second, defendant's appropriation not only provides Internet users with competing and directly opposing information, but also prevents those users from reaching plaintiff and its services and message. *In that way, defendant's use is classically competitive: he has taken plaintiff's mark as his own in order to purvey his Internet services—his web site—to an audience intending to access plaintiff's services.*

*Id.* at *6 (emphasis added).

▮ In this case, the Defendant has done more than merely register a domain name. He has created, in his words, a "bogus 'Jews for Jesus'" site intended to intercept, through the use of deceit and trickery, the audience sought by the Plaintiff Organization. Moreover, the Defendant Internet site uses the Mark[33] and the Name of the Plaintiff Organization as its address, conveying the impression to Internet users that the Plaintiff Organization is the sponsor of the Defendant Internet site. Although the Defendant Internet site does not solicit funds directly like the defendant's site did in *Planned Parenthood,* the Outreach Judaism Organization Internet site (available through the hyperlink) does do so through the sale of certain merchandise. The Defendant does not argue that the Outreach Judaism Organization site is not commercial in nature. Considering the limited nature of the Defendant Internet site and its hyperlink to the Outreach Judaism Organization Internet site, it is apparent the Defendant Internet site is a conduit to the Outreach Judaism Organiza-

tion Internet site, notwithstanding the statement in the Disclaimer that "[t]his website ... is in no way affiliated with the Jewish organization Outreach Judaism...." *See supra,* note 17; *see also supra,* note 15.

The conduct of the Defendant also constitutes a commercial use of the Mark and the Name of the Plaintiff Organization because it is designed to harm the Plaintiff Organization commercially by disparaging it and preventing the Plaintiff Organization from exploiting the Mark and the Name of the Plaintiff Organization. *See Panavision,* 945 F.Supp. at 1303. In addition, the Defendant Internet site has and will continue to inhibit the efforts of Internet users to locate the Plaintiff Organization Internet site. *See id.*

The Plaintiff Organization has demonstrated a likelihood of success on its claim of dilution under Section 1125(c).

### 3. Unfair Competition and False Designation of Origin Claims

▮ Count III of the Complaint alleges unfair competition and false designation of origin pursuant to 15 U.S.C. § 1125(a) ("Section 1125(a)"). Section 1125(a) states, in relevant part,

> (1) Any person who, on or *in connection with any goods or services,* or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) *is likely to cause confusion,* or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who

---

**33.** To the extent possible, the Defendant copied the Mark as his domain name. As explained, a stylized letter "O" ("✡") in the word "for" cannot be used in a domain name.

believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125 (emphasis added). The test for unfair competition under Section 1125(a) is essentially the same as that for trademark infringement under Section 1114, namely whether there is a likelihood of confusion between the marks. *Fisons*, 30 F.3d at 473. As discussed above, the Plaintiff Organization has demonstrated there is a likelihood of confusion if the Defendant is permitted to maintain his Internet site.

 In order to prevail on a false designation of origin claim, the Plaintiff Organization must prove by a preponderance of the evidence that:

(1) the defendant uses a false designation of origin, as defined in the Act;

(2) that such use of a false designation occurs in interstate commerce *in connection with goods and services;*

(3) that such false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship, or approval of the defendant's goods or services by another person; and

(4) that the plaintiff has been or is likely to be damaged.

*See AT & T Co.*, 42 F.3d at 1427 (emphasis added).

### a. *False Designation of Origin*

The Defendant stated that he intended for his "bogus" Internet site to intercept persons looking for the Plaintiff Organization Internet site. *See* Exhibit J to the Complaint. The Defendant also stated he intended to use "deceit and trickery" to direct persons to his Internet site. *See* Exhibit 3 to Perlman Amended Aff. The Defendant Internet site was designed to be a false designation of origin.

### b. *Use in Interstate Commerce in Connection with Goods and Services*

The Defendant contends, without any explanation or analysis, that the Plaintiff has not demonstrated that his activities are done "in connection with any goods or services." *See* Defendant Brief 27–28. This contention is without merit.

 The requirement that the activities of an infringer be done "in connection with any goods or services," does not require the infringer to actually cause goods or services to be placed into the stream of commerce. *See Juno*, 979 F.Supp. at 691 (finding mere acquisition of domain name constituted "in connection with goods and services"). Rather, all that is needed is that the trademark violation be "in connection" with any goods or services. *See id.*

The activities of the Defendant are "in connection" with goods and services for several reasons. First, the hyperlink in the Defendant Internet site to the Outreach Judaism Organization Internet site is designed to promote the viewpoint of the Outreach Judaism Organization and to encourage the purchase of the products and services offered by that organization. Second, as explained in *Planned Parenthood,* the

> defendant's use of plaintiff's mark is "in connection with the distribution of services" because it is likely to prevent some Internet users from reaching plaintiff's own Internet web site. Prospective users of plaintiff's services who mistakenly access defendant's web site may fail to continue to search for plaintiff's own home page, due to anger, frustration, or the belief that plaintiff's home page does not exist.... Therefore, defendant's action in appropriating plaintiff's mark has a connection to plaintiff's distribution of its services.

*Planned Parenthood,* 1997 WL 133313, at *4 (discussing "in connection with goods or services" requirement in context of Section 1114 claim). In this case, because of the similarity of the domain name used by the Defendant with the Mark and Name of the Plaintiff Organization, the conduct of the Defendant is not only designed to, but is likely to, prevent some Internet users from reaching the Internet site of the Plaintiff Organization; as well it diverts visitors to the Outreach Judaism Organization site which is commercial in nature. As such, the conduct of the Defendant is "in connection with goods and services" as that term is used in Section 1125(a).

#### c. *Likelihood of Confusion*

As discussed, the maintenance of the Internet site by the Defendant is likely to cause confusion.

#### d. *Likelihood of Injury*

The Defendant asserts the Plaintiff Organization has not proved, nor can it, that it has been or will be damaged by his activities. *See* Defendant Brief at 28. In support of this conclusory assertion, the Defendant states that the affidavits filed on behalf of the Plaintiff Organization demonstrate how readily users can switch out of his Internet site if they so desire. As such, the Defendant contends the Plaintiff is no worse off than when there was no Internet site associated with his domain name in question because individuals can still access the Plaintiff Organization Internet site. *See id.* at 28–29. The Defendant admits, however, that the "reputation" of the Plaintiff Organization is being harmed by him, but, he asserts, in a constitutionally protected way. *See* Defendant Brief at 29.

As explained later in this opinion, the Plaintiff Organization has demonstrated that it has and will suffer irreparable injury through the use of the Mark and the Name of the Plaintiff Organization by the Defendant in his domain name.

#### e. *Non–Commercial Speech*

The Defendant contends his conduct is exempted from Section 1125(a) because it is "non-commercial speech." *See* Defendant Brief at 28. As discussed, however, the conduct of the Defendant is commercial in nature.

Based on the foregoing, the Plaintiff Organization has demonstrated a likelihood of success on its claims of unfair competition and false designation of origin.

#### 4. *State Law and Common Law Claims*

Counts IV, V and VI of the Complaint allege the Defendant is liable for trademark infringement and dilution under New Jersey law, as well as liable for common law unfair competition. The Defendant contends the Plaintiff Organization has failed to make out a prima facie case under New Jersey law because its claims under state law are no better than those under federal law. *See* Defendant Brief at 32.

#### a. *Infringement*

■ Section 56:4–1 of the New Jersey Statutes ("Section 56:4–1") provides:

> No merchant, firm or corporation shall appropriate for his [, her] or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals.

N.J.S.A. 56:4–1. Section 56:4–1 is the state-law equivalent of Section 1125(a). *See Apollo Distrib. Co. v. Jerry Kurtz Carpet Co.*, 696 F.Supp. 140, 143 (D.N.J.1988). In New Jersey, therefore, the statutory and common law test for trademark infringement is whether a likelihood of confusion exists. *See id.; Christian Science Bd. of Dirs. v. Evans*, 191 N.J.Super. 411, 419, 467 A.2d 268, 272 (Ch. Div.1983), *aff'd in part and rev'd in part on other grounds*, 199 N.J.Super. 160, 169, 488 A.2d 1054, 1058 (App.Div.1985), *aff'd*, 105 N.J. 297, 520 A.2d 1347 (1987). As discussed, a likelihood of confusion exists.

#### b. *Dilution*

Section 56:3–13.20 of the New Jersey Statutes ("Section 56:3–13.20") provides:

> The owner of a mark which is famous in this State shall be entitled, subject to the principles of equity, to an injunction, commencing after the owner's mark becomes famous, against another person's use of the mark which causes dilution of the distinctive quality of the owner's mark, and to obtain other relief provided in this section. In determining whether a mark is famous, a court may consider factors such as, but not limited to:
>
> a. The degree of inherent or acquired distinctiveness of the mark in this State;
>
> b. The duration and extent of use of the mark in connection with the goods and services;
>
> c. The duration and extent of advertising and publicity of the mark in this State;
>
> d. The geographical extent of the trading area in which the mark is used;

e. The channels of trade for the goods or services with which the registrant's mark is used;

f. The degree of recognition of the registrant's mark in its and in the other's trading areas and channels of trade in this State; and

g. The nature and extent of use of the same or similar mark by third parties.

The owner of a famous mark shall be entitled only to injunctive relief in this State in an action brought under this section, unless the subsequent user willfully intended to trade on the owner's reputation or to cause dilution of the owner's mark. If willful intent is proven, the owner shall also be entitled to any other remedies set forth in this act, subject to the discretion of the court and the principles of equity.

N.J.S.A. 56:3–13.20. Section 56:3–13.20 appears to be the state-law equivalent of Section 1125(c). For the reasons previously discussed, the use by the Defendant of his domain name likely will cause dilution of the Mark and the Name of the Plaintiff Organization under state law.

### c. *Common Law Unfair Competition*

Count VI of the Complaint alleges the use by the Defendant of his domain name is actionable under the New Jersey common law of unfair competition. The test for unfair competition under New Jersey law is identical to the test for unfair competition under Section 1125. *See AT & T Co.,* 42 F.3d at 1433. As discussed, it is likely that the use by the Defendant of his domain name constitutes unfair competition.

### B. *Extent to Which the Plaintiff Organization Will Suffer Irreparable Injury if a Preliminary Injunction is Not Issued*

██ · In order to obtain injunctive relief, a party must make a clear showing of "immediate irreparable injury" or a "presently existing actual threat." *Acierno v. New Castle County,* 40 F.3d 645, 655 (3d Cir.1994). The mere risk of irreparable harm or the possibility of a remote future injury is not enough.

*See id.* The word irreparable "connotes 'that which cannot be repaired, retrieved, put down again [or] atoned for.'" *Id.* at 653. As such, the Plaintiff Organization must demonstrate that, absent the issuance of a preliminary injunction, it will suffer harm which cannot be redressed sufficiently following a trial of the matter. *See id.* at 652; *One World Botanicals Ltd.,* 987 F.Supp. 317, 336 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir. 1989)). In other words, the issuance of a preliminary injunction must be the only way to protect the Plaintiff Organization from injury or harm. *See id.; see also Opticians,* 920 F.2d at 195 (quoting *Morton v. Beyer,* 822 F.2d 364, 372 (3d Cir.1987)). Economic loss does not constitute "irreparable harm." *See Acierno,* 40 F.3d at 652 (quoting *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)).

██ A party's "'mark is his [or her] authentic seal; by it he [or she] vouches for the goods which bear it; it carries his [or her] name for good or ill.'" *See Opticians,* 920 F.2d at 195 (quoting *Ambassador East, Inc. v. Orsatti, Inc.,* 257 F.2d 79 (3d Cir.1958)). Where one party misappropriates the trademark of another, the offending party is using the reputation of the trademark owner for self gain. Such unauthorized use causes injury and harm, even if the offending party has not tarnished the mark or diverted any sales by its use. *See Opticians,* 920 F.2d at 195. Trademark infringement, therefore, "amounts to irreparable injury as a matter of law." *S & R. Corp.,* 968 F.2d at 378.

██ A party also may demonstrate "irreparable injury" where it shows it has lost control of its reputation and goodwill by another's use of its mark. *See id.* (citing *Opticians,* 920 F.2d at 195). In addition, where a plaintiff makes a strong showing of a likelihood of confusion, irreparable injury follows as matter of course. *See Opticians,* 920 F.2d at 196; *S & R. Corp.,* 968 F.2d at 378; *One World Botanicals,* 987 F.Supp. at 336.

The Plaintiff Organization has demonstrated a likelihood that the Defendant is infringing upon the Mark and the Name of the

Plaintiff Organization. Irreparable injury, therefore, is established. *See S & R. Corp.,* 968 F.2d at 378. Furthermore, the Plaintiff Organization has demonstrated a likelihood of success on each of its claims. The use of the Mark and the Name of the Plaintiff Organization by the Defendant has interfered with the ability of the Plaintiff to control the Mark and the Name of the Plaintiff Organization. This in turn creates the potential for damage to the reputation of the Plaintiff Organization, especially in light of the disparaging comments the Defendant and the Outreach Judaism Organization have made. *See One World Botanicals,* 987 F.Supp. at 336. The Plaintiff Organization should not be required to leave its reputation in the hands of the Defendant, especially when the Defendant intends to destroy the reputation of the Plaintiff Organization. *See Caesars World,* 490 F.Supp. at 828.

The Plaintiff Organization has made a strong showing of a likelihood confusion if the Defendant is permitted to maintain his Internet site. It follows that the Plaintiff Organization will suffer irreparable injury if a preliminary injunction is not issued. *See Opticians,* 920 F.2d at 196; *One World Botanicals,* 987 F.Supp. at 336; *see also S & R. Corp.,* 968 F.2d at 378. Finally, money damages cannot compensate the Plaintiff for its potential injuries because the injuries involve incalculable harm to the reputation of the Plaintiff. *See Opticians,* 920 F.2d at 196; *One World Botanicals,* 987 F.Supp. at 336 (citing *Chips N. Twigs, Inc. v. Chip–Chip, Ltd.,* 414 F.Supp. 1003, 1019 (E.D.Pa.1976)). This factor strongly favors of the issuance of a preliminary injunction. *See, e.g., Playboy,* 985 F.Supp. 1220, 1997 WL 605377, at *1; *Hasbro,* 1996 WL 84853, at *1; *Juris,* 1996 WL 376600 at *1.

#### C. *Extent to Which the Defendant Will Suffer Irreparable Harm if a Preliminary Injunction is Issued*

The Defendant cannot complain he will suffer irreparable injury if a preliminary injunction is issued because he misappropriated the Mark and the Name of the Plaintiff Organization with full knowledge of the rights of the Plaintiff. *See S & R. Corp.,* 968 F.2d at 379 (stating self-inflicted harm is outweighed by injury to trademark owner where infringement is occurring); *Opticians,* 920 F.2d at 197 (by virtue of its recalcitrant behavior, party cannot "hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself.").

Even if the Defendant could so complain, he is unable to demonstrate that he will suffer irreparable harm if a preliminary injunction is issued. First, the Defendant has not expended a considerable amount of time or money maintaining his Internet site because it contains very little information and functions primarily as a link to the Outreach Judaism Organization Internet site. Second, the Defendant is able to continue his speech about the Plaintiff Organization on another Internet site, provided the new domain name does not create a likelihood of confusion with the Name of the Plaintiff Organization or the Mark. This task should be easy considering the Defendant is a professional Internet site developer. *See* Brodsky Certif. ¶ 3.

Based upon the foregoing, this factor also favors of the issuance of an injunction. *See, e.g., Playboy,* 985 F.Supp. 1220, 1221; *Hasbro,* 1996 WL 84853, at *1; *Juris,* 1996 WL 376600 at *1.

#### D. *Extent to Which the Public Interest Favors the Plaintiff*

Where a party demonstrates both the likelihood of success on the merits and irreparable injury, "it almost always will be the case that the public interest will favor" the issuance of an injunction. *AT & T Co.,* 42 F.3d at 1427 n. 8.

In trademark cases, "the public interest is 'most often a synonym for the right of the public not to be deceived or confused.'" *S & R. Corp.,* 968 F.2d at 379 (quoting *Opticians,* 920 F.2d at 197); *One World Botanicals,* 987 F.Supp. at 337. As explained in *Transfer Print Foils v. Transfer Print Am.,* 720 F.Supp. 425 (D.N.J.1989),

[t]he public is entitled to rely on valid mark as identifying the products it has come to associate with that mark.... [T]he public is entitled to not be confused

or deceived by improperly appropriated marks.

*Id.* at 441.

In the case at bar, because the Plaintiff Organization has demonstrated both a likelihood of success on the merits and irreparable injury, the public interest favors the issuance of an injunction. *AT&T Co.,* 42 F.3d at 1427 n. 8. The issuance of an injunction will protect the public from the deceptive and confusing use of the Mark and the Name of the Plaintiff Organization by the Defendant. *See, e.g., Playboy,* 985 F.Supp. 1220, 1997 WL 605377, at \*1; *Hasbro,* 1996 WL 84853, at \*1; *Juris,* 1996 WL 376600 at \*1. Moreover, the public will not be deprived of the content of the comments from the Defendant because he is free to publish on an Internet site that does not infringe upon the Mark or the Name of the Plaintiff Organization.

### III. *Conclusion*

For the reasons stated, the Order to Show Cause seeking a Preliminary Injunction is granted.