**SNA, INC. and Silva Enterprises Limited, Plaintiffs,**

v.

**Paul ARRAY and Horizon Unlimited, Defendants.**

**Richard F. Silva and SNA, Inc., Plaintiffs,**

v.

**Douglas Karlsen, a/k/a Douglas Jaworski t/a Turbine Design, Inc., Defendant.**

**Nos. Civ.A. 97–7158, Civ.A. 97–3793.**

United States District Court, E.D. Pennsylvania.

May 28, 1999.

Terry Elizabeth Silva, Philadelphia, PA, for Richard F. Silva, SNA, Inc., plaintiffs.

Martin A. Pedata, Palm Harbor, FL, Tracey Oandasan, Woodstown, NJ, for Douglas Karlsen, defendant.

Richard F. Klineburger, III, Philadelphia, PA, for Paul Array, Horizon Unlimited, movants.

Martin A. Pedata, Palm Harbor, FL, Tracey Oandasen, Acton and Point, Woodstown, NJ, for Turbine Design, Inc., movant.

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, Senior District Judge.

The plaintiffs in these two consolidated cases are Richard Silva and two companies he operates, SNA, Inc. and Silva Enterprises, Ltd (SEL). Through these companies, Silva is in the business of manufacturing do-it-yourself kits for an amphibious aircraft called the Seawind. The defendants are Douglas Karlsen and a company he operates called Turbine Design, Inc. and Paul Array and a company he operates called Horizon Unlimited. Both of these companies are involved in the seaplane industry in various ways.

In these lawsuits, Silva contends that the defendants have breached contracts with his company, have defamed him and disparaged his company, have infringed on his company's trademark and trade dress rights, have engaged in unfair competition by misappropriating his company's trade secrets, have interfered with his company's contractual relations and prospective business relations, and have engaged in a civil conspiracy. Defendants Karlsen and Turbine Design have counterclaimed, alleging antitrust violations and seeking to invalidate Silva's patent and trademark.

Plaintiffs have moved for a preliminary injunction. Upon consideration of the motion, the defendants' responses thereto, and after a hearing, the court makes the following findings of fact and conclusions of law.

### Preliminary Injunction Standard

In deciding whether to grant a preliminary injunction, the court must consider whether: (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of relief; (3) granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) granting the preliminary relief will be in the public interest. *See Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 879 (3d Cir.1997). A request for preliminary relief should only be granted if the court is convinced that all factors favor the relief. *See Opticians Ass'n of Amer. v. Independent Opticians of Amer.,* 920 F.2d 187, 192 (3d Cir.1990). Plaintiffs have a high burden in showing irreparable injury:

> Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury. The requisite feared injury or harm must be irreparable—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it.

*ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987) (internal quotes and cites omitted). An injunction should not be granted if a legal remedy is available: "The availability of adequate monetary damages belies a claim of irreparable injury." *Frank's GMC Truck Ctr., Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988).

### Breach of Contract

All the defendants admit that they have caused molds to be made from a Seawind. Turbine Design hired Piranha

Boats, Inc. to make several molds of the plane (as well as at least one from a canopy stolen from SNA's canopy subcontractor and sold to Turbine Design through a middle-man), and Piranha Boats, Inc. did so. The molds are now at Piranha Boats' shop and Turbine Design's shop, where they have been held unused since this litigation began.[1]

On this record, it is unclear whether Karlsen breached a contractual obligation to plaintiffs. The pieces of paper bearing Karlsen's signature are unclear as to just what was agreed (i.e., whether he agreed not to copy parts from any Seawind, or just from the particular planes to which these contracts explicitly refer). The ambiguities are not persuasively resolved by the parol evidence on this record. It is also unclear whether Array breached his purchase agreement with SNA, because it is unclear whether the non-copy provision in the contract would apply to a situation where he had molds made from a plane other than his own.[2]

Additionally, as to both Horizon Unlimited's contract and Karlsen's contracts, if the parol evidence does establish they mean what plaintiff contends, there is a serious question whether the contracts are enforceable as a matter of public policy because of their attempt to create a pri-

vate patent for a product not qualifying for federal patent law protection. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (holding that Florida statute prohibiting using direct molds to copy unpatented boat hulls was pre-empted by federal patent laws); *compare Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979) (ruling that private agreement did not run afoul of patent law because it did not forbid anyone from copying an unpatented product).

If, notwithstanding these factual and legal obstacles, plaintiffs are able to prove their claims, money damages will provide an adequate remedy at law, as there is no demonstrated threat of future harm which injunctive relief can rectify in any practicable way.

### Defamation and Commercial Disparagement

 For purposes of the preliminary injunction, the court can only be concerned with statements currently on one or the other of defendants' webpages. Any defamation or disparagement that was there in the past and has since been removed is properly remedied by a damages action, and the court cannot enjoin possible future defamation.[3] During closing argument,

---

1. The parties report that all the molds but one are being held there unused under a Florida court order (which has not been made a part of the record here). With regard to that one (the hull/tail mold held at Turbine Design's shop), defense counsel represented to the court during closing argument that Karlsen has no intent to use it for any purpose until the present litigation is resolved.

2. It is unclear whether Mr. Array individually will also be liable for damages because the Purchaser's Signature line on the contract is ambiguous, but that issue can await another day. The individual defendants raise the defense to several of the claims that only the corporations acted and thus the individuals cannot be liable. With regard to each of these claims of individual immunity, the court notes that it is to be decided at trial whether the individuals' personal involvement in the acts alleged subject them to individual liability, whether through piercing the corporate

veil or otherwise. *See, e.g., Donsco., Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3d Cir.1978) ("A corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort.").

3. Even if some of the past material in the newsletter and on the websites has defamed plaintiffs, the court cannot "enjoin the dissemination of future issues of a publication because its past issues had been found offensive"; to do so would constitute a prior restraint violative of the First Amendment. *See Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 445, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957) (discussing *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)); *see also Kramer v. Thompson,* 947 F.2d 666, 677–80 (3d Cir.1991) (although the panel found cases holding otherwise convincing, the clear position of the Pennsylvania courts is to adhere to

plaintiff's counsel conceded that the court should not edit anyone's web page.

The type of statements made on Horizon Unlimited's webpage is seen by examining the site's "Seawind Information Menu," which is in essence a table of contents to all the Seawind-related materials on the site. *See* Pl.Ex. 25. It contains each back issue of the Seawind Builders Newsletter and some listings with titles such as "My Plane" and "A lane Called the Seawind." It also contains an entire sections called "SNA and Dick Silva," with titles including "Dick Silva commits Patent Fraud," "Dick Silva copies parts," and "Dick Silva copies more parts." [4] Every listed title is a link to a page of the site that then contains detailed materials and commentary on the named topic.

■ Plaintiffs have some likelihood of success of proving that some of the childish and mean statements made on the website defame Silva or disparage SNA, if they are able to point to particular statements and prove the required elements as to those particular statements, which they have not successfully done on the present record. If they do, there will an adequate remedy at law for damages if the statements are untrue and there is no persuasive showing of irreparable injury which can be prevented by a preliminary injunction at this time.

### Trademark Infringement

■ In trademark infringement cases, the ongoing likelihood of confusion itself constitutes an irreparable injury. *See Op-*

*ticians Ass'n of Amer. v. Independent Opticians of Amer.*, 920 F.2d 187, 195–97 (3d Cir.1990) (holding that "since we have already held that the concurrent use of [plaintiff's mark by the defendants] creates the likelihood of confusion, the inescapable conclusion is that there was also irreparable injury"). Thus, the irreparable injury inquiry is folded into the consideration of plaintiffs' likelihood of success on the merits.[5]

The plaintiffs have a federally registered trademark consisting of a Seawind logo, and they claim to have a common law trademark in the word Seawind alone. The defendants use the word Seawind in their businesses in various ways: Turbine Design uses the phrase "Turbine Seawind" in marketing its services and has begun marketing a plane named the Harpoon that has been advertised as a "six-place Seawind" or "Super Seawind." Horizon Unlimited operates the Seawind Pilots Association, publishes The Seawind Builders Newsletter, and maintains a website with the domain name seawind.net. Plaintiffs allege that each of these uses infringes on their trademark rights.

■ To prove a trademark infringement claim, the plaintiff must establish three elements: "(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origins of the goods or services." *Fisons*

the traditional rule against enjoining defamation); *Terminix Int'l Co., L.P. v. Kay*, 150 F.R.D. 532 (E.D.Pa.1993) (Rule 11 sanctions imposed on plaintiff's attorney for continuing to pursue an injunction against defamation, even after being told by the court that such an injunction could not lawfully be granted).

4. It contains another section called "Silva and his Lawsuits," which has a subsection called "SNA's Legal Staff." Those sections contain copies of papers filed in various lawsuits and commentary about the suits. Whether through a mistaken understanding of the legal proceedings or through deliberate

intention, those sections contain misleading statements.

5. One other factor is essentially folded into that same inquiry—the public interest, which in trademark cases is "a synonym for the right of the public not to be deceived or confused." *See Opticians*, 920 F.2d at 197, *citing* 2 McCarthy § 30:21; *see also id.* at 198 ("Having already established that there is a likelihood of consumer confusion ..., it follows that if such use continues, the public interest would be damaged.").

*Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994).

### The Common Law Trademark At Issue

 The mark containing the word "Seawind" with a picture of a plane over it and two wavy lines under it is registered as Trademark Number 1,797,717. *See* Pl.Mot.Ex. A. The word "Seawind" alone is not a federally registered trademark. The description of the registered mark in the Patent and Trademark Office notice is "SEAWIND and design." That description does not mean, as plaintiffs contend, that the word is registered and the design is registered; it means, rather, that the composite mark made up of the combination of the word *and* the design is registered.[6] There is no infringement of plaintiffs' registered mark, because no defendant has used that mark.[7] So, the question at issue in this case is whether plaintiffs have a protectable common law trademark interest in the unregistered mark "Seawind" and, if so, whether defendants have infringed upon that interest by their various uses.

 Every mark falls within one of four categories:

arbitrary (or fanciful terms), which bear no logical or suggestive relation to the actual characteristics of the goods; suggestive terms, which suggest rather than describe the characteristics of the goods; descriptive terms, which describe a characteristic or ingredient of the article to which it refers, and generic terms, which function as the common descriptive name of a product class.

*Express Serv., Inc. v. Careers Express Staffing Serv.,* 176 F.3d 183, 185 (3d Cir.

1999), *quoting A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 296 (3d Cir.1986). A mark is suggestive if it suggests something about the product but "requires imagination, thought or perception to reach a conclusion as to the nature of the goods." *Dranoff–Perlstein Assoc. v. Sklar,* 967 F.2d 852, 858 (3d Cir.1992) (describing the "imagination test" used to demarcate the boundary between suggestive and descriptive marks, with descriptive marks defined as those which "forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods").

 The court finds that the word "Seawind" is suggestive as the name of plaintiff's product. The word suggests that the product has something to do with air and water, and in fact describes an environmental condition in which the product might be found; but it does not convey an immediate idea of the product itself. It requires imagination to associate the idea of seawind with the plane.

For an unregistered mark, the "valid and protectable" element of an infringement claim is satisfied if the mark is inherently distinctive, and suggestive marks are inherently distinctive. *See Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 291 (3d Cir.1991). Because the mark "Seawind" is suggestive, it is inherently distinctive and the first element of the claim is satisfied.

 The second element, ownership, is satisfied by a showing that the plaintiff was the first party to adopt a mark and that the plaintiff continuously uses it in commerce. *See Ford Motor Co.,* 930 F.2d at 292. Here, plaintiffs have used the name continuously since acquiring the

---

6. Plaintiffs' counsel on several occasions also seemed to refer to the plane itself as trademarked. This, of course, is not accurate; trademark protection extends to words or marks used to identify the source of a product, not the product itself.

7. Because the registered mark is not actually at issue in this case, it is not necessary to consider defendants' arguments that Silva

made misstatements in the application and that only one of Silva's companies is the proper owner of the mark. SNA, which is a plaintiff in both cases, is the user of the Seawind mark. The court notes that the only evidence on this point tends to show that as a layperson filling out the application, he made innocent mistakes, which conduct would not rise to the level of unclean hands.

rights to it in 1991. The name was used by the plaintiffs' predecessor in interest since the 1960's. Because adoption and continuous use are shown, ownership is satisfied.

*Likelihood of Confusion*

Plaintiffs' contention as to each allegedly infringing use is that potential customers will be led to believe there is a relationship between the defendant and SNA of affiliation, connection, or sponsorship. See 15 U.S.C. § 1125(a)[8]; J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th Ed.) § 23.8 (1996).

▆▆▆▆ Likelihood of confusion exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Ford Motor Co.*, 930 F.2d at 292, *quoting Scott Paper Co. v. Scott's Liquid Gold. Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978). The Third Circuit has established a ten-factor test to be used in deciding whether a likelihood of confusion exists: (1) the degree of similarity between the marks; (2) the strength of the mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market. *See Ford Motor Co.*, 930 F.2d at 293; *citing Scott Paper Co.*, 589 F.2d at 1229.

The court will discuss each allegedly infringing use separately, but some of the ten factors apply similarly to each instance. First, the strength of the Seawind mark in the public's mind. The court does not have much evidence on this point, except that the defendant submitted evidence that there are approximately twenty-five Seawind aircraft now flying and there have been approximately 130 kits sold, and there are over 1700 amphibian aircraft in the market according to Federal Aviation Authority records. There is evidence that SNA attends the two major air shows each year, from which it might be inferred that the Seawind name is known to the community, but it is difficult to gauge the extent to which that is true, and the court is unwilling to speculate. Overall, on the record presented at the hearing, the mark is not very strong.

Next, in each instance the intended audience is the same for both plaintiffs and defendants, namely, the experimental aircraft community and potential purchasers and builders of kit planes. Relatedly, the plaintiffs and defendants communicate with this intended audience through the same channels, such as trade shows, newsletters, an internet websites.

Especially important in the circumstances of this case is the degree of care expected from the relevant consumers. A Seawind kit costs approximately $50,000, and to build a Seawind to completion costs considerably more. It requires thousands

---

**8.** Section 1125(a)(1)(A) prohibits the following:

> Any person who, on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person....

of hours and a certain level of technical knowledge and ability to build a plane. Even customers who hire a company such as Turbine Design to assemble the plane for them must have the level of knowledge and ability necessary to fly the plane. Given the expense and level of commitment involved, the small pool of potential customers in the build-it-yourself seaplane market can be presumed to exercise a high degree of care. *See Ford Motor Co.*, 930 F.2d at 293 ("some buyer classes, for example . . . buyers of very expensive goods, will be held to a higher standard of care than others").

### Turbine Seawind

Defendant Turbine Design assembles the kits for Seawind purchasers, and it installs a turbine engine (the Seawind kit does not include an engine, and SNA contends the plane is not designed to accommodate safely a turbine engine). It calls this finished product a "Turbine Seawind," and it advertises, or at least displays, the Turbine Seawind on its webpage and elsewhere.

Throughout this litigation, Turbine Design has pressed the contention that it is using the phrase "only as a descriptive term of the services they are performing for customers requesting or wanting the respective Seawinds built with a turbine engine." Resp. to Mot. at 36. That contention makes no syntactical sense: "Turbine Seawind" is used to refer to the finished product, as short-hand for "a Seawind in which we have put a turbine engine." The way defendants use it, though, is more objectionable than simply saying "a Seawind in which we have put a turbine engine." The name Turbine Seawind might very well lead a person looking at the webpage to believe that it is another version of the Seawind put on the market by the same company that makes the Seawind, or at least that Turbine Design has SNA's permission to call it that. By way of illustration, the same company that makes Coke makes Diet Coke and Cherry Coke; if another company began adding pineapple flavoring and marketing Pineapple Coke, consumers might well mistakenly believe that company was associated with or had the approval of Coke.

What happens if a person sees the advertisement for a Turbine Seawind and decides she wants one? If the potential customer calls Turbine Design and says, "I want a Turbine Seawind," they cannot sell her one. They can only refer her to SNA to buy the Seawind kit and then offer their services in assembling her plane. The initial confusion is corrected. Plaintiffs do not lose business as a result of that transaction; if anything, they sell a Seawind kit that they otherwise might not have. A customer could not go through an entire purchase transaction and remain under the mistaken impression that Turbine Design manufacturers either the Seawind or a Turbine Seawind, and a customer cannot mistakenly purchase a Turbine Seawind when she meant to purchase a Seawind. In defendants' view, this means that there is no likelihood of confusion and thus no infringement.

Plaintiffs' argument, however, is not that a potential Seawind customer will be tricked into buying a plane from Turbine Design instead of from SNA, but that potential customers will be led to believe there is a relationship between Turbine Design and SNA of affiliation, connection, or sponsorship, or that SNA approves of Turbine Design's turbine conversion of the Seawind. In particular, a potential customer who had heard of the Seawind might think that plaintiffs had authorized Turbine Design to make and market the Turbine Seawind. This is undesirable to plaintiffs not only because they in general do not want to be thought to be associated with Turbine Design, but because plaintiffs strongly contend that turbine engines should not be put in the Seawind. They argue that the plane was not designed to handle the forces inflicted on it when flown at speeds possible with a turbine engine, that using such an engine could be danger-

ous, and that the plane will perform poorly in certain regards with that type of engine. If a Seawind with a turbine engine performs poorly or dangerously, and someone witnessing or hearing about that performance believes that the Turbine Seawind is associated with or approved by plaintiffs, then the Seaweed's reputation and the plaintiffs' good will are harmed.

The degree of similarity between the two marks is high, since "Turbine Seawind" is plaintiff's exact mark with a word added. Defendants contend that they are using the term "Turbine Seawind" only as a descriptive term of the services they are performing for customers requesting or wanting their respective Seawinds built with a turbine engine. Karlsen testified that it is common practice to refer to any plane with a turbine engine in it as a turbine plane; he refers to other types of planes for which his company provides turbine conversions in the same manner, for example the Turbine Malibu and the Turbine Thrush. There is common sense to this explanation, and the court takes it as evidence of benign intent. His deeply felt and well documented animosity toward plaintiffs is also evidence that his intent is not to confuse people into believing his company is associated with SNA.

To show actual confusion, the plaintiffs rely on the a guestbook that formerly appeared on Turbine Design's Internet web page. The comments are somewhat inscrutable, although some do seem to express a belief that Turbine Design is an official distributor of the Seawind. Plaintiffs have not offered testimony from any of these people to further explain their comments, and the court gives them little weight.

■ Based on all these considerations, especially the persuasiveness of Karlsen's explanation for the common usage of turbine as a descriptive modifier, the court finds that plaintiffs have not demonstrated a likelihood of confusion caused by Turbine Design's use of the phrase Turbine Seawind.

*Seawind Builders Newsletter*

Horizon Unlimited publishes a bimonthly newsletter called "Seawind Builders Newsletter." Each issue of the newsletter contains a disclaimer that the newsletter is "[n]ot affiliated with any aircraft manufactures [sic], kit builders or marketers." SNA sends mailings to Seawind customers and builders. It sends Builders Alerts, which are important updates on assembly instructions. It also periodically sends a newsletter called "Seawind Newsletter." Plaintiffs claim that defendants' use of the name "Seawind Builders Newsletter" is likely to cause confusion among the people who receive it as to the authorized status of that newsletter.

In the newsletter published after this lawsuit was initiated, Horizon Unlimited printed this statement of the purpose of the newsletter: "We have started this newsletter to try and help the Seawind community. . . . Whether good news or bad all news has to be reported and you are the ones that decide which to weed out. . . . We need to make this aircraft the best in the skys." Pl.Mot.Ex. 8. This rather noble statement of intent is belied by a memo Array sent to Karlsen on August 14, 1997, accompanying an earlier edition of the newsletter to be prepared for distribution: "I need to fry this bastard and I think this will do it. Maybe we can put him out of business and go into the kit business." Pl.Mot.Ex. 8. This is rather astounding evidence as to defendants' intent in publishing the newsletter, and it was confirmed by Karlsen's testimony that Array's purpose in publishing the newsletter is to get under Silva's skin.

■ The court finds that plaintiffs have not shown that the defendants' use of the name "Seawind Builders Newsletter" is likely to cause confusion. The people who receive the defendants' newsletter also receive plaintiffs' newsletter and can compare and contrast the two to distinguish between them, especially with the

help of the disclaimer and with the critical tone of defendants' publication.

*seawind.net*

■ Defendant Horizon Unlimited maintains a website with the domain name "seawind.net," on which it publishes copies of each Seawind Builders Newsletter and other information and commentary about the Seawind, SNA, and Silva. Domain names are not exempt from trademark protection; if a user uses a mark in connection with any goods or services in a way that is likely to cause confusion, mistake or deception as to the affiliation, connection or association of the accused person or as to the origin of the goods, services or commercial activities of the accused person, then that usage violates the Lanham Act. *See* 15 U.S.C. § 1125(a)(1)(A); 4 *McCarthy on Trademarks* (4th Ed.1999) § 25:76 at 25–144 ("Should the domain name cause confusion with a senior user's mark, the Lanham Act could be violated. In such disputes, the normal rules of trademark infringement will apply.").

Other district courts have examined the use of a plaintiff's trademark as a defendant's domain name and found it to violate the Lanham Act. *See, e.g., Jews for Jesus v. Brodsky,* 993 F.Supp. 282 (D.N.J.), *aff'd,* 159 F.3d 1351 (3d Cir.1998); *Planned Parenthood Fed'n of Amer. v. Bucci,* Civ. A. No. 97 civ. 0629, 1997 WL 133313 (S.D.N.Y. Mar. 24, 1997), *aff'd,* 152 F.3d 920 (2d Cir.), *cert. denied,* 119 S.Ct. 90, 142 L.Ed.2d 71 (1998). Both *Jews for Jesus* and *Planned Parenthood* found that an Internet user searching for the plaintiff's website who unwittingly entered defendant's website was likely to be confused about the relationship between plaintiff and defendant.

■ The same is true here. Horizon Unlimited's use of plaintiffs' exact mark for defendant's website address is highly likely to cause confusion. Someone looking for official information about the Seawind will likely go to this address, either by guessing it and typing it in directly or by using a search engine and choosing this site from those listed because it sounds the most official.[9] Internet users expect that a site with a domain name that is a trademark is somehow related to the owner of the trademark. It is highly likely that a person visiting this website would think there is a relationship between the company that makes the Seawind and a company using Seawind for its domain name. It is true that the highly critical and mean-spirited content of the website would indicate to a person examining its entire contents that this is not an SNA-sponsored or -approved website, but that might just add further to the viewer's confusion about

9. Users searching for a specific Web site have two options. First, if users know or can deduce the address of a Web site, they can type the address into a browser and connect directly to the Web site as if dialing a telephone number. More often, users do not know the exact address and must rely on "search engines" available on the Web to search for key words and phrases associated with the desired Web site. Because of the quantity of information of the Web, searches often yield thousands of possible Web sites. Such a cumbersome process is rarely satisfactory to businesses seeking to use the Web as a marketing tool. Instead, businesses would prefer that customers simply be able to find a Web site directly using a corporate name, trademark or service mark. *Lockheed Martin Corp. v. Network Solutions, Inc.,* 985 F.Supp. 949, 952 (C.D.Cal.1997) of (internal citations omitted); *see also* Danille Weinberg Swartz, Comment, *The Limitations of Trademark Law in Addressing Domain Name Disputes,* 45 UCLA L.Rev. 1487, 1491–92 (1998) ("Many businesses choose to use their trademarks as domain names because consumers are already familiar with those marks and may favorably associate quality with the trademarks. Given this trend, Internet users often guess that a product's trademark also serves as the domain name that accesses a website with information about the product."); 4 *McCarthy on Trademarks* § 25.73 at 25–122–23 ("[T]hrough habit and convention, Internet users have come to expect that to reach the web site of a company they should be able to type in the name of the company or its major trademark....").

just what the relationship is. In any case, the initial confusion of drawing the viewer to the site is the relevant confusion.

Horizon Unlimited argues that the presence of a disclaimer on the website precludes any finding of a likelihood of confusion, but argument fails. *See Jews for Jesus,* 993 F.Supp. at 303 ("[d]ue to the nature of Internet use, defendant's appropriation of plaintiff's mark as a domain name and home page address cannot adequately be remedied by a disclaimer," *quoting Planned Parenthood,* 1997 WL 133313, at *12). As stated above, the relevant confusion that the domain name causes is drawing the web user to the site in the first place, and the disclaimer cannot fix that.

*Harpoon Advertising*

██ Turbine Design has marketed a plane called the Harpoon. Some advertising materials for it, specifically a flier displayed and distributed at the Sun'N'Fun air show in 1997, called it a "six-place Seawind." No Harpoon has been built, and Karlsen testified that the project has been abandoned. Thus, the advertising will not be ongoing and any injury to plaintiff caused by that use of its trademark can be adequately remedied by damages.

**Trade Dress Infringement**

Plaintiffs claim product configuration trade dress protection for a combination of elements in the Seaweed's design that give it a sleek, swept-back look. They claim that by marketing and manufacturing either the Harpoon or the SeaStar, defendants are infringing on that trade dress.

No Harpoon plane actually exists, and Karlsen testified that he has abandoned all plans to make the Harpoon. Without a product to compare with the Seawind, it is unlikely that plaintiffs could succeed on their claim that the Harpoon infringes on the Seaweed's trade dress. Moreover, there is nothing for the court to preliminarily enjoin.

Plaintiffs argue that the defendants' counterfeiting scheme has changed its object from producing the Harpoon to producing a plane called the SeaStar. Evidence was presented that a company called Precision Design and its president Craig Easter are in fact developing a plane called the SeaStar. Plaintiffs contend that defendants are involved in that venture as joint venturers, but they have not proven that on this record. Therefore, on this record the court cannot attribute any infringement by the SeaStar to these defendants. Further, plaintiffs have the same problem with the SeaStar as with the Harpoon; namely, there is no plane yet built. Therefore, they have not shown a likelihood of success on the merits, and no threat of immediate irreparable injury.

**Unfair Competition**

Plaintiffs contend that defendants have misappropriated plaintiffs' trade secrets by copying parts, and have engaged in other forms of unfair competition by lying about plaintiffs on their websites and elsewhere, and by acquiring a stolen part. The evidence indicates that Karlsen may be liable, together with the corporation he controls, for tortious interference with plaintiffs' business relationships. There is some evidence that he acted with a wrongful intent to injure or destroy plaintiffs' business. It is also arguable that Karlsen was acting to advance his own business rather than with the intent to destroy plaintiffs' business, which is allowed in a free enterprise system even if plaintiffs suffer a loss from his activities. In either event, plaintiffs have not demonstrated the irreparable injury which justifies injunctive relief at this stage. The market rather than the court is the better arbiter of whether Karlsen's turbine engine is suitable for use in the Seawind. The market rather than the court is the better arbiter of whether the airplanes assembled from the kit plaintiffs sell is too heavy to fly safely and needs lighter parts. However, if the parties choose to litigate these issues, the proper legal forum is the suit for damages; a

preliminary injunction is too blunt a tool to resolve this dispute, and an unnecessary one. Plaintiffs put on evidence of declining sales of their airplane kits; if they can prove Karlsen and his corporation breached a contract or tortiously caused this loss, they will be entitled to a damage award.

There is some evidence that Karlsen conspired to steal parts of plaintiffs' airplane kit to make replacement molds which he planned to hold available for sale. It is difficult to evaluate the credibility of the deposition testimony on which this allegation is based. On the present record, the court cannot find that the plaintiffs have met their burden of establishing a likelihood of success, although there is certainly a distinct possibility of success on the merits. If plaintiffs establish this contention at trial, Karlsen and his corporation are exposed to both compensatory and punitive damages, as well as a permanent injunction putting them out of the business of profiting from stolen parts.

The task at trial will be to separate the truth from the parties' mutual paranoia and hatred. Whether the other defendants are part of this conspiracy is also an issue which cannot be reasonably determined from this record, but which remains an issue for trial. Why these parties continue their destructive battles rather than terminate their vicious relationship is a mystery to the court. They have had repeated opportunities to resolve their mutually destructive internecine war with mediation by judicial officers other than the present trial judge. They seem to prefer mutual destruction to peace, regardless of their own interests, their families or their sanity.

*Conclusion*

For the above reasons, the court concludes that, should plaintiffs ultimately succeed in proving their claims, money damages will provide an adequate remedy for each claim but trademark infringement. Plaintiffs have not shown a likelihood of success on the merits on any of the trademark claims but trademark infringe-

ment against Horizon Unlimited as to its use of "seawind.net." A preliminary injunction will issue regarding only the use of the domain name, and the remainder of the motion will be denied.

An appropriate Order follows.

### ORDER

**AND NOW,** this 28th day of May, upon consideration of Plaintiffs' Motion for a Preliminary Injunction, defendants' responses thereto, and after a hearing, it is hereby **ORDERED** as follows:

1. Defendants Horizon Unlimited and Paul Array are enjoined from using the domain name "seawind.net" for any website; and

2. The motion is otherwise **DENIED** for the reasons stated in the foregoing Findings of Fact and Conclusions of Law.